# DECISIONS

## OF THE

# Supreme Court of Florida.

### JANUARY TERM, A. D. 1899.

THE FLORIDA CENTRAL AND PENINSULAR RAILROAD COMPANY, APPELLANT, VS. SARAH A. FOXWORTH, APPELLEE.

1. It is permissible in pleading to refer to, and thereby make a part of one count, the whole or a part of the allegations of another count in the same declaration. To be effective, however, the reference must be definite and certain.

2. A party appellant is confined to the specific grounds of objection made by him to questions propounded to witnesses in the trial court.

3. The provisions of section 1, Chapter 3744, act 1887, and section 2, Chapter 4071, act 1891, are applicable in a suit instituted by a widow to recover damages for the death of her husband by the wrongful act of a railroad company under the provisions of Chapter 3439, acts of 1883.

4. The provisions of section 1, Chapter 3744, having been repealed, but substantially re-enacted by Chapter 4071, act of 1891, under a well-settled rule of construction, were not by such repeal destroyed or interrupted in their operation, but continued in full force.

5. The use of the term "gross negligence" in a charge to the jury where other instructions recognize contributory negligence as a ground for apportioning damages, and the jury are instructed not to give exemplary damages, does not of itself define, nor

does it include, that extreme degree of negligence which is wanton or reckless of injurious consequences.

6. An instruction merely asserting an abstract legal proposition, without attempting to apply it to the facts of the particular case on trial, is not amenable to the objection that it assumes as proven any matter of fact in dispute.

7. An instruction to the effect that it is negligence "to back a train, without a brakeman at the rear end as a lookout, across the main thoroughfare of a village when there is no flagman at the crossing, even at a rate but little faster than a person walks," asserts a correct legal proposition.

8. An instruction that "a railroad company operating its trains on the thoroughfare of a village must use greater care than in less frequented localities, and any neglect of any precautions proper in the peculiar circumstances of the locality constitutes negligence," asserts a correct legal proposition.

9. The duties of a railroad company with respect to care in operating its trains are dictated and measured by the exigencies of the occasion, or in the light of the conditions of things at the place where, and the time when, an accident happens; and the building up of a town along its line of road, causing the operation of its trains at that place to be attended with greater danger to others than formerly, imposes a duty upon the railroad company to exercise such additional care as the circumstances reasonably demand.

10. An instruction assuming as proven fact matters which upon the trial are in dispute is erroneous.

11. Under the provisions of section 1, Chapter 3744, act 1887, contributory negligence operates only in reduction or diminution of damages, and the injured person or (in case of his death) his widow suing under Chapter 3439, act 1883, is entitled to recover if the defendant's negligence was one of the proximate causes contributing to the injury, notwithstanding the negligence of the injured person was greater than that of defendant, but the damages must be diminished by the jury in proportion to the default attributable to such injured person.

12. Where a railroad track is laid along a street in a town or village, one is not a trespasser upon said railroad track who crosses the street in which it is laid at a place other than a public crossing, or the intersection of other streets.

13. If an injury occurs so near a public crossing that the means

required to be adopted by those operating a train to enable a traveler to cross in safety at the crossing if carried out, would have enabled the person injured to cross in safety at the place of the accident, the liability of the railroad company will be measured by the legal principles applicable to public crossings.

14. In operating its trains in the streets of towns and villages and in the immediate vicinity of public crossings, a railroad company is bound to keep a lookout when making flying switches or backing cars by the "kicking back" process, and when it is apparent, or when in the exercise of reasonable diligence commensurate with the surroundings it should be apparent to the company that a person on its track or about to get on its track under such circumstances is unaware of his danger or cannot get out of the way, it becomes the duty of the company to use such precautions by warnings, application of brakes, or otherwise, as may be reasonably necessary to avoid the injury; for, in such cases, though the person injured may have been negligent, the company will if negligent, under Chapter 3744, act of 1887, still be liable, though the damages must be diminished in proportion to the default attributable to such injured person.

15. Though a person about to cross a railroad track at or near a public crossing, or in a street, may be guilty of contributory negligence in failing to look and listen, yet if the company by omitting any act required of it under the circumstances, such as ringing a bell, blowing a signal, or stationing lookouts, directly contributed to the injury to such person by the trains of such company, the company will be liable in damages, to be diminished by the jury in proportion to the contributory negligence of the injured person; but if the negligence of the company did not directly or proximately contribute to the injury it will not be liable.

16. In railway operation the dangerous practice of "kicking cars" or making flying switches in populous localities and near public crossings, imposes upon the company a duty to station a lookout upon the rear of the cars, the equivalent of which is not accomplished by ringing the engine bell.

17. It is the duty of railroad companies in operating their trains to give notice of the approach of such trains at all points of known or reasonably apprehended danger, notwithstanding the statute (section 33, p. 287, McClellan's Digest) only requires

them to ring the engine bell before crossing the streets of an incorporated town.

18. Where the widow sues for damages for the death of her husband by the wrongful act of another, in estimating her pecuniary loss the jury may properly take into consideration her loss of the comfort, protection and society of the husband in the light of all the evidence in the case relating to the character, habits and conduct of the husband as husband, and to the marital relations between the parties at the time of and prior to his death; and they may also consider his services in assisting her in the care of the family, if any; but the widow is not entitled to recover for her mental anxiety or distress over the death of her husband, nor for his mental or physical suffering from the injury. She is also entitled to recover reasonable compensation for the loss of support which her husband was legally bound to give her, based upon his probable future earnings and other acquisitions, and the station or condition in society which he would probably have occupied, according to his past history in that respect, and his reasonable expectations in the future; his earnings and acquisitions to be estimated upon the basis of deceased's age, health, business capacity, habits, experience, energy and his present and future prospects for business success at the time of his death. All these elements to be based upon the probable joint lives of the widow and husband. She is also entitled to compensation for loss of whatever she might reasonably have expected to receive in the way of dower or legacies from her husband's estate, in case her life expectancy be greater than his. The sum total of all these elements to be reduced to a money value and its present worth to be given as damages. Within these limits the jury exercise a reasonable discretion as to the amount to be awarded, based upon the facts in evidence and the knowledge and experience possessed by them in relation to matters of common knowledge and information.

Appeal from the Circuit Court for Duval county.

*Statement.*

On April 23, 1891, the appellee brought suit against appellant in the Circuit Court of Duval county, the declaration, filed on May 1, alleging in substance in the first count that plaintiff was the widow of one Daniel A. Fox-

worth, deceased; that defendant, a Florida railroad cor-
poration before, after and during each day of the month
of December, 1890, was operating and managing a cer-
tain railroad extending between certain named points in
this State and through the town of Callahan, in Nassau
county, with its chief offices in Jacksonville; that said
Daniel A. Foxworth, husband of plaintiff, on the ——
day of December, 1890, in the light of day, in the usual
course of foot travel, and in the exercise of due caution,
proceeded to cross the track of defendant's railroad at a
place on its track in the town of Callahan where the peo-
ple in said town were accustomed and had the right to
cross the track in going from the street on one side to
the street on the other side of said town, as divided by
the railroad; and while the deceased was then and there
in the usual course, with due degree of caution, crossing
said track at a point where he was entitled to cross, the
defendant wrongfully, carelessly and negligently pro-
pelled backward its cars towards, and upon said Fox-
worth, and then and there, by means of its cars so man-
aged and operated by defendant, did wronfully, negli-
gently and carelessly throw down, run over and kill said
Foxworth, to plaintiff's damage of $50,000.

The second, third, fourth and fifth counts read as fol-
lows: "And for a second count the plaintiff avers each
and every the allegations of the first count, and further
alleges that the said defendant did not then and there
give the usual or proper signal or signals, and did not
then and there give the usual or proper warn-
ing or warnings, and the plaintiff claims fifty
thousand dollars. And for a third count the
plaintiff avers each and every the allegations of the
first count, and further alleges that the said cars so then
and there propelled backward by the defendant as afore-

said were stationary next before the said Daniel A. Foxworth proceeded to cross said track, and were then and there suddenly and rapidly propelled backward upon the said Daniel A. Foxworth, and did then and there kill, as aforesaid, the said Daniel A. Foxworth, and plaintiff claims $50,000. And for a fourth count the plaintiff avers each and every allegation of the first count, and further alleges that the said deeds of commission and omission, each and every on the part of said defendant above complained of, were reckless and wanton, and plaintiff claims $50,000. And for a fifth count the plaintiff avers each and every the allegations of the first, second and third counts, as set forth above, and plaintiff claims $50,000."

Defendant demurred to the second, third, fourth and fifth counts, insisting that these counts were incomplete in themselves, and that it is not permissible to incorporate into subsequent counts the allegations of previous ones by reference merely. The demurrer was overruled, and this ruling is the basis for the first assignment of error.

At the Fall term, 1891, of the court, defendant having pleaded not guilty, a trial was had, resulting in verdict for plaintiff in the sum of $25,000. Defendant's motion for a new trial was denied upon plaintiff's entering a remittitur for $20,000, and from the judgment entered for plaintiff this appeal was taken at the same term in open court.

The evidence showed that Callahan was a small village of sixty to one hundred and fifty inhabitants; that the defendant's line of railroad at that point was built about the year 1858; that most of the houses in the village were built after this time; that the accident occurred at a point in the village where the railroad

track runs upon a level grade through the business portion of the same (stores or business houses being located upon each side of the track) and within ten to fifty feet south of where a public road crosses the railroad track; that the deceased, who was between fifty and eighty years of age, attempted to walk diagonally across the railroad track at this point, going from the postoffice to his home, with an open umbrella to protect him from rain, held in such a position as to shut off his view of a train approaching from the north, and was struck by a car propelled by the "kicking back" process from the north almost immediately after entering upon the track, and before he could cross it, he being at the time apparently unaware of the approach of a train. There was much conflict in the evidence upon almost every point, particularly whether the engine bell rang when the car first started, or at the time of or before the accident, whether there was a brakeman or lookout on the rear end of the car, whether the cars were run any distance before being detached from the engine, or whether the engine was not run back upon the car with great violence, and thereby the car set in motion just immediately before the collision with the deceased. The train carrying passengers and express had just arrived, and, according to one witness, was making "a kind of flying drill to butt the coaches down below the warehouse," after stopping at the depot above, so that the engine could put off the box cars on the side track. There was evidence tending to show that even after the car struck the deceased, his life might have been saved by a person on the rear end of the car. We shall not undertake to state all the evidence, but the foregoing will suffice to show the bearing of the charges given or refused.

Defendant's witness, M. Dean, testified that he was

the conductor on defendant's train at the time of the accident; that it was customary at all stations to ring the engine bell when moving a train backward or forward; that the engine bell on this special occasion was ringing when the train started back, and at the time of the accident.   On cross-examination the plaintiff's counsel asked him: "Q. How do you recall the specific ringing of that particular bell on that morning any more than you recall the ringing at the next station?  A. I could not hear it at the next station.   Q. But if you were present at the next station.  Is there any fact that enables you to recall this ringing to your memory any more distinctly than you could recall the ringing the next morning, or at the next stopping place?"  This question was objected to upon the ground that it was argumentative.  The court overruled the objection, and the exception taken constitutes the basis of the second assignment of error.

The court charged the jury upon the question of negligence, at plaintiff's request: "1. It is gross negligence to back a train without a brakeman at the rear end as a lookout, across the main thoroughfare of a village, when there is no flagman at the crossing, even at a rate but little faster than a person walks."  "3. A railroad company operating its trains on the thoroughfare of a village must use greater care than in less frequented localities, and any neglect of any precautions, proper in the peculiar circumstances of the locality, constitutes negligence."  "4. If pushing a train increased the risk of plaintiff's husband, it was negligence on the part of the defendant not to give timely notice of what it was doing."  "5. The jury are instructed that while it was the duty of the plaintiff's husband, in crossing the railroad track of the defendant, to look and listen for approaching

trains with such care as an ordinarily prudent man would have used, yet that failure on his part to do so, if the jury find there was a failure on his part to do so, was not such contributory negligence as would bar plaintiff's right of recovery, if they further find that the defendant, after seeing the plaintiff's husband, or after it should, in the exercise of due care, have seen the plaintiff's husband on its track, or so near thereto as not to have space to pass clear, failed to exercise all proper means to avoid the accident." "8. Although one injured by a collision may have failed to exercise ordinary care and prudence, and thereby contributed remotely to the injury complained of, yet if the accident was directly caused by negligence of the company, the latter will be liable." "11. If the jury find from the evidence that the husband of plaintiff received injuries resulting in his death, upon the track of the defendant company, which the deceased was crossing, lying upon a thoroughfare of the village of Callahan, while the defendant company was engaged in transferring a car from the main to the side track, by putting the train in motion running towards the switch, and before it was reached and when sufficient momentum to answer the purpose had been acquired, the engine was detached, and the car by the momentum thus acquired was to be carried beyond the side track upon the main line; and they further find that the car thus intended to be thrown beyond the side track had a momentum which carried it along said thoroughfare at the rate of five miles per hour, the company was guilty of a degree of negligence from which the company is not excused by the fact, if the jury find it to be a fact, that the engineer in charge of the switching rang the bell in response to a signal given him by the conductor of the train, to put the train in motion, if they further find the

defendant company after seeing the plaintiff's husband, or after it should in the exercise of due care have seen the plaintiff's husband on its track, or so near thereto as not to have space to pass clear, failed to exercise all proper means to avoid the accident." And upon its own motion as follows: "If you find from the evidence that the defendant's servants exercised all ordinary and reasonable care in backing their train at the time the husband of plaintiff was injured and that the injury was due solely to the neglect of plaintiff's husband, then you will find the defendant not guilty; but if you find that the servants of defendant were guilty of any negligence and did not back its train with all ordinary and reasonable care and caution, and the injury was accasioned by the negligence of both the defendant and the husband of plaintiff, then the plaintiff may recover, but the damages must be diminished by the jury in proportion tc the amount of negligence of which the husband of the plaintiff was guilty." And refused the following in. structions requested by the defendant. "5. If you find from the evidence that the bell was not rung and no whistle blown, and no one was on the rear end of train, yet if deceased was approaching and attempting to cross defendant's track, he was not absolved from the duty of looking up and down the track to see whether a train was approaching, and if failure to take that precaution was the proximate cause of the injury to the deceased Foxworth, then plaintiff can not recover damages in this cause." "10. The laws of Florida only require bells to be rung on the engine of a train before crossing the streets of incorporated cities, and if you find from the evidence that the town of Callahan was not an incorporated city and that the tracks of defendant's railroad at Callahan is not upon a street of an incorporated city, then no duty

was upon defendant's employes to ring said bell before said engine began to move." "13. That Chapter 4071, Laws of Florida, entitled, 'An Act defining the liabilities of railroad companies in certain cases,' does not apply to this case, same having been passed by the legislature after the facts occurred alleged in the declaration on which plaintiff bases her right of action." "17. If the jury find that contributory negligence of deceased was gross, he can not recover; but that if his contributory negligence has been slight, as compared with the negligence, on the part of the defendant, defendant would be liable."

Upon the question of damages the court gave the following instructions in behalf of plaintiff: "6. The law imposes upon the husband the duty of supporting the wife, and gives to the wife a legal claim, in addition to such support, to the society, comfort and protection of her husband, and the deprivation of these are proper elements to be considered by the jury in assessing damages." "7. If the jury find for the plaintiff, it is their duty to give such damages as the widow may have sustained by reason of the death of her husband, and as the jury may deem fair and·just with reference to the injury resulting to her from such death." "9. What the life of a husband may be worth is a question incapable in its nature of exact determination. How this value is to be measured and what shall be the amount of the damages resulting to the widow plaintiff, must be left largely to the discretion of ·the jury." "10. In suits to recover damages for wrongfully causing death of another, under the statutes, the injury sustained may be estimated from the facts proven, in connection with the knowledge and experience possessed by all persons in relation to matters of common observation."

And of its own motion instructed the jury as follows: "The measure of plaintiff's damages in a cause like this is such sum as would be equal to the probable earnings of deceased, taking into consideration his age, health, business capacity, habits and experience and value of his services in the care of his family, and you may also take into consideration the loss of comfort, society and protection of deceased, but you can not take into consideration either the pain and suffering of deceased, or the grief and wounded feelings of his surviving relatives in estimating any damages you may allow." And refused the following instruction requested by defendant: "14. The plaintiff is only entitled to recover as damages such sum as would be equal to the probable earnings of the deceased taking into consideration his age, health, business capacity, habits and experience and value of his services in the care of his family. You are not to take into consideration either the pain or suffering of the deceased, or the grief and wounded feelings of his surviving relatives in estimating any damages you may allow, but only the pecuniary loss to plaintiff estimated by deceased's probable future earnings and his ability to care for plaintiff." The giving and refusal of these instructions constitute the basis of the remaining assignments of error.

*John A. Henderson and John C. Cooper*, for Appellant.

*A. W. Cockrell & Son*, for Appellee.

*Brief in Reply to Brief for Appellant.*

December 15th, 1890, appellant crushed the life out of appellee's husband by running its cars upon him in the town of Callahan. Jury and verdict for appellee, in the sum of $25,000 damages. Thereupon, the appellant filed the following motion:

F. C. & P. Ry. Co. v. Foxworth.—Brief of Appellee.

"Now comes the defendant and moves the court for a new trial and to set aside the verdict in this cause on following grounds:

1. The verdict is contrary to the evidence.

2. The verdict is contrary to law.

3. The verdict is contrary to the charge of the court.

4. The damages are excessive.

5. There was no sufficient evidence on which the jury could assess the damages, as found by them.

6. The court erred in giving charges numbered, 1, 3, 4, 5, 6, 7, 8, 9, 10 and 11, as asked by the plaintiff.

7. The court erred in giving its own charges as given.

8. The court erred in refusing to give defendant's charges numbered 5th, 10th, 13th, 14th, 17th, as asked by defendant.

9. The verdict is uncertain in form, and no verdict."

The court, on the hearing of this motion, "did consider and decide that if the plaintiff would remit all her damages so found, in excess of $5,000.00, that the said motion should be overruled, otherwise the same should be granted, and the plaintiff having in open court remitted all her damages so found, in excess of $5,000.00, the said court did decide and order as follows:" "The plaintiff having in open court remitted all of the damages assessed by the jury, in excess of $5,000.00, the motion for a new trial is overruled and refused. Defendant excepts."

And thereupon judgment was rendered for $5,000.00 against appellant.

The appellant, unwilling to pay the judgment so rendered, appeals to this court; brings here a stenographic report of the trial, and contents itself with twenty assign-

ments of error, covering every step in the case from the declaration to the judgment.

In so far as these assignments of error are based on the rulings of the court on the pleadings, or the rulings of the court upon the evidence, or on the charges of the court, or its refusal to charge, bearing on the *fact* of appellant's responsibility, as distinguished from the *measure* thereof, they may have a legitimate place in the record; but that a defendant, against whom a verdict of the jury is rendered for $25,000.00, can, upon motion for a new trial, based upon the ground that the damages are *excessive*, have the damages reduced by the court to $5,-000.00, and *then* assign error in this court based on the claim that the *reduced* damages are excessive, is not admitted.

Certainly there was no motion made, if, indeed, such a motion could have been made, in the court below for a new trial, based on the ground that the *reduced* damages, $5,000.00, are excessive. Nor did the court pass upon such a motion *sponte sua*.

Degener v. O'Leary, 19 S. W. Rep. Texas, June 7, 1892, 1004 S. C. 85 Texas Sup. Court 171.

White vs. Blair, 10 So. Rep. (Ala.), 257.

At the common law, and in the Federal courts, motion for new trial based upon the ground that the damages awarded by a verdict are excessive, are addressed exclusively to the trial judge; and his action thereon is non-revisable by a reviewing court.

Lincoln vs. Power, 151 U. S. 436.

And so, here, except in so far as the common law has been displaced by statutory provisions.

The statute provides, Rev. Stat. Sec. 1180, *when* motions for new trials, orders on which are reviewable on appeal, Rev. Stat. Sec. 1265, must be made, *and to whom*.

F. C. & P. Ry. Co. v. Foxworth.—Brief of Appellee.

The motion for a new trial, orders on which are reviewable, must be made within four days, after *verdict before the trial court.*

Many of the matters, made in terms reviewable, by Sec. 1265, were reviewable without that section.

But we are concerned in the case at bar with the motion for a new trial in so far only as it is based upon the ground the verdict of the *jury* is excessive; and we concede for the purposes of this case, the legitimacy of reviewing in this court the motion for a new trial, in so far as that motion is based upon grounds *other* than the ground that the verdict of the jury is excessive, and other than the charge, or refusal to charge, if any, which prejudicially affected the appellant, in producing that excess. Whatever of legal wrong, if any, the corporation has suffered by reason of the alleged excessive verdict of the jury has been rectified at its instance, and upon its motion, addressed to the court below; that excess, if any, and the charges or refusals to charge, if any, which produced it, did not go into the *final judgment* from which *alone*, under Sec. 1265, an appeal lies to this court.

The foregoing sections of the Revised Statutes are for convenience referred to as embodying the statutory law in existence at the time of the trial; although the Revised Statutes were not then in existence.

And so, we submit, whether the verdict of the jury was excessive or not, or whether the damages which were entered up in the judgment were excessive or not, cannot be reviewed by this court, in the exercise of appellate jurisdiction.

If appellant's counsel desired to raise this question here, and have reviewed the verdict of the jury, they should have permitted *it as rendered* to become the basis of the final judgment of the court. Neither the common

law, nor the statute, permit this court in any event to re-
vise a verdict of the jury, upon the ground it is excessive
unless that verdict is entered up in the final judgment
appealed from. It is the judgment, *not*·the verdict,
which operates a prejudice.

Let us advert, for a moment, to the argument of
counsel for appellant, found on page 18 of his brief, as
follows: "Under the court's construction of the law, the
jury were left to say how much plaintiff's negligence
diminished the damages without the slightest rule or
method to arrive at a result, leaving the jury to depend
upon the speculative whims or prejudices of the jury."

If the speculative whims or prejudices of the jury,
say $20,000.00 worth, went into *that* verdict, the afore-
said whims and prejudices, say $20,000.00 worth did *not*
get into the *final* judgment, by which *final judgment*, if at
all, appellant is *"aggrieved*;" and from which *alone* it can
appeal.

The appellant, as this record discloses, interposed the
calm, sober, discriminating intelligence of the court be-
tween the alleged speculative whims and prejudices of
the jury and its entry of judgment, and eliminated,
thereby, from the final judgment so much of that ver-
dict, say four-fifths thereof, as represented the alleged
speculations, whims and prejudices of the jury.

Blunt vs. Little, 3 Mason 102, and cases therein cited.

And so it is, if speculation, whim or prejudice, dis-
charged of the control of rule of method, entered into the
final judgment of $5,000.00, recovered in this case, and
from which *alone* appellant can or does appeal, it was
the speculation, whim or prejudice of the court, *not* the
jury.

And so, too, paraphrasing the argument of appel-

lant's counsel, heretofore quoted: "Under the court's construction of the law, the court was left to say, upon appellant's motion for a new trial based on the grounds disclosed in the motion for a new trial, *and did say* how much plaintiff's negligence diminished the damages without the slightest rule or method to arrive at a result, leaving the court to depend upon the speculative whims or prejudices of the court."

The appellee was willing to stand upon the verdict, and judgment thereon, as the verdict was returned by the jury.

It was the appellant, as the record discloses, who appealed to the Circuit Court, in its motion for a new trial, for a review and correction of the errors set up therein; and having, on that appeal, secured a reduction of the damages from twenty-five thousand dollars to five thousand dollars, for which last sum final judgment was rendered, it does not lie in the mouth—no, it has no mouth —in the chartered competency of this corporation to say, on this appeal, in this court, that the damages which went into that final judgment were ascertained arbitrarily or capriciously or from prejudice, and without "regard to the slightest rule or method to arrive at a result."

If, then, the pleadings state a legal case, and that case as stated finds sufficient support in legal evidence to sustain the judgment rendered, this court will be governed by the same considerations, in affirming or reversing that judgment, that would apply, had a jury been waived in the court below, and a trial had without a jury, and a general finding and judgment thereon in the court below been reached, upon the pleadings and evidence and appellant's objections thereto, and the general finding and assessment of damages, and judgment thereon,

been rendered, subject to the appellant's objections thereto found in this record.

Certainly, the appellant will not be permitted to assign errors, and to appeal to the corrective appellate jurisdiction of this court, *in all respects,* as if the court below had refused, in acting on its motion for a new trial, to correct the alleged excessive damages, and had in fact rendered final judgment on the verdict of the jury for $25,000.00.

And yet the errors assigned, and the appeals made, in the arguments addressed to this court, in the brief of counsel of appellant, are precisely those and none other than those which would have been assigned and made, had judgment been rendered against appellant, for $25,-000.00.

A reversal-compelling error, which an appellate court entertains, is a *prejudicial* error; and error prejudicing the appellant *in the judgment* appealed from. Or, as it is otherwise expressed, *error and injury* must concur to justify reversal. An error, whose effect does not enter into the judgment as rendered, is not such an error.

Error, too, must be *affirmatively* shown; it is not enough that the Appellate Court cannot see that the judgment of the Circuit Court was right; unless *shown* to be wrong, the presumption of correctness arises.

Duckworth, Ex'rs, vs. Butler and wife, 31 Ala. 164.

Taylor vs. Kelley, 31 Ala. 59.

A motion for a new trial addresses itself to the conscience, the judgment of the court, as matured by its further reflection and deliberation upon the whole facts and the whole law arising in the course of its rulings, upon the pleadings, the admission and rejection of testimony, and its charges and refusal to charge; in a word, upon the whole case made by the pleadings and the facts.

In hearing, and acting upon, a motion for a new trial, it sits, *pro hac vice*, as an Appellate Court, charged with the duty of correcting its own errors, as well as the mistakes or errors of the jury. In the practical administration of justice, to which it is invoked by a motion for a new trial, its conservative judgment is frequently, and in the interest of both parties, looking to putting a period to litigation, exercised in granting or refusing to grant a new trial, not absolutely, but conditionally.

The winning plaintiff, may on this motion, be compelled to abate somewhat the verdict he has recovered; otherwise to be subjected to the costs, delay and uncertainty of a new trial; on the other hand, the prevailing defendant may be required to concede something to his losing adversary, or incur the expense and hazard of another trial.

Assuredly, neither the letter nor the spirit of the statutes permit a defendant to avail himself of a motion for a new trial, and thereby force his adversary to yield up four-fifths of the amount awarded him by the verdict of the jury, and accept judgment for one-fifth thereof, as the price of the denial of the motion, and then prosecute his appeal from such denied motion, with precisely the same advantage of objection and exception, as if judgment had been entered against him, upon his motion unconditionally denied, and for the full amount of the verdict.

We submit, therefore, the assignments of error in this appeal from the final judgment of the court must be confined to the errors, if such there be, entering, prejudicially to the appellant, into the judgment for $5,000; it cannot embrace errors, if any, which entered into the verdict for $25,000.

The presumptions, which support the judgment of

the Circuit Court, can be displaced *only* by an *affirmative* showing, on the part of the appellant, upon this record, of prejudicial error affecting the judgment that was actually rendered.

And this presumption, thus to be overcome, is equally cogent that the court below, in reducing the damages assessed from $25,000 to $5,000 on the motion of the appellant, corrected at appellant's instance *all* the errors, whether of the *court* or the *jury*, then on the record, which went into that verdict.

Insisting upon the foregoing views, and subject thereto, we proceed to discuss the errors assigned in the order of discussion pursued by appellant.

The defendant's demurrer to the 2d, 3d, 4th, 5th, 6th, 7th and 8th counts of plaintiff's declaration presents a *formal*, and not a *substantive*, objection. But we insist the objection is not tenable, even if formal objections were allowed. The reproduction, bodily and in terms, of the allegations in the first count, in the second, third and fourth counts, severally, would have swollen those several counts to unwieldy proportions, without adding one particle to their legal sufficiency, perspicuity or exactness. Hence the pleader, in effect and in substance and in terms, and to the manifest convenience of the adversary counsel and of the court, by averring each and every allegation of said first count, in the said several other counts, made those allegations substantive allegations of the said several other counts. This method of pleading, so far from being objectionable, as a matter of form, enables the court and the adversary counsel, at once, readily to grasp the difference between the several counts, without comparing them word by word, by having attention directed to the added allegations, which

separate in legal effect and distinguish the several counts.

The adversary, in the first four counts, was made to know with exactness, and in the tersest, simplest form, what he was required to meet. And so are the authorities, Chitty on Pleading, 16 Am. Ed., p. 428.

The demurrer was overruled as to the first four counts, upon which issue being taken, trial was had on the plea of not guilty.

The legal effect of this plea is clearly defined in Rule 71, Circuit Court Rules. It operates as a *denial* only of the breach of duty or wrongful act alleged to have been committed. The rule, in terms, declares "no other defence than *such denial* shall be admissible under that plea," and in terms declares "all other pleas in denial shall take issue on some particular matter of fact alleged in the declaration."

The declaration to which the single plea of not guilty was pleaded sets up, after the usual averments, that "Daniel A. Foxworth, now deceased, then in life, and the husband of plaintiff, on the —— day of said month of December, 1890, in the light of day, in the usual course of foot travel, and in the exercise of due caution, proceeded to cross the track of the said railroad so operated and managed, as aforesaid, by said defendant, at a place on said track in said town where the people in said town were accustomed, and had the right, to cross said track in going from the street on one side to the street on the other side of said town as divided; and while the said Daniel A. Foxworth was then and there in the usual course, with due degree of caution, crossing said track at a point where he was entitled to cross, the defendant wrongfully, carelessly and negligently propelled backwards its cars towards and upon the said

Daniel A. Foxworth, and then and there the said defendant did wrongfully, carelessly and negligently throw down, run over and kill the said Daniel A. Foxworth. And the plaintiff claims fifty thousand dollars."

The second count sets up, in addition, that said defendant did not then and there give the usual or proper warnings or signals.

The third count sets up, in addition to the allegations of the first count, that said cars were stationary next before the accident, and were propelled suddenly and rapidly backwards.

And the fourth count alleges that said deeds of omission and commission were reckless and wanton.

By stipulation, the ownership by defendant of the line of railroad *as set* up in the declaration, *and* at Callahan, on which it is alleged plaintiff's husband was killed, was admitted.

In whatever confusion or uncertainty adjudged cases may have left the law as to the *scope* of the issue presented to *such* a declaration by the plea of *not guilty*, no adjudication holds that the denial raised thereby challenges the *right* of the plaintiff's deceased husband, distinctly set up in the declaration, to cross the defendant's track, so dividing the streets of Callahan, at the particular time and place, where the killing occurred; nor is it in any case affirmed that the plea of not guilty calls in question the fact, distinctly averred, that the people of said town were accustomed, and had the right, to cross said track at *that* point in going from the street on *one* side to the street on the *other* side of said town so divided by said track. The restricted application of the plea of "not guilty," as defined in the rule, in terms not only negatively but affirmatively, rejects a construction that would embrace a denial, in said plea, of *such* right or *such*

fact.   The rule is "all *other* pleas in denial," that is other than the denial of "the breach of duty, or wrongful act, alleged to have been committed," "shall take issue on some particular matter of fact alleged in the declaration."

Whether, however, under the plea of "not guilty," the plaintiff can recover at all, "without adequate proof that he took active measures of precaution to guard against the accident," presents a wholly different question hereinafter discussed.   These "precautions," whatever the measure thereof may be, must in any *possible* theory of the defense presented, be determined upon the *concessions* made by the defendant's single plea of not guilty, that the plaintiff's husband had the *right* to cross defendant's track, at that time and place, and that it was the accustomed *right* of the people to pass at that point.

It may be contended there is a qualification to the rule that contributory negligence is a matter of defense to be pleaded and proved by the defendant, under the force of which qualification, if it appears, from the plaintiff's own evidence in support of his cause of action, that a presumption of contributory negligence by the deceased is fairly inferable from said evidence, the burden of proof is shifted and it becomes incumbent on the plaintiff to remove such presumption.

It will be observed no charge was asked by the appellant on this phase of the case; nor did the court give any instructions postulated upon the theory that plaintiff's evidence at any stage shifted the presumption of negligence so as to put the burden on the plaintiff of affirmatively removing such presumption.

If the appellant during the progress of the trial saw that the evidence of the plaintiff in support of her case, *under the issue joined*, was of such a nature as to justify such instructions, it should have asked for them, and if

denied, it should have reserved an exception for the consideration of this court.

But as Yniestra's case is so relied on by appellant, it may not be out of place to consider that case, in connection with the rule of pleading under discussion. It is true, the ruling was made in Railway Co. vs. Calderwood, 89 Ala. 254; S. C. 7 So. Rep. 360, that the burden of proving contributory negligence is *not* on the defendant when it is shown by the evidence introduced by the plaintiff. But this ruling has been repudiated in subsequent cases, Railway Co. vs. Davis, 92 Ala. 312; S. C. 9 So. Rep. 252; Kansas City, &c. vs. Crocker, 11 So. Rep. 267; S. C. 95 Ala. 412. The opinion of the court in the Kansas City case, delivered by Walker, J., on petition for rehearing is in our judgment unanswerable.

It will be observed too that the general issue, in Alabama, by force of statute, puts in issue *"all* the material allegations of the complaint;" whereas the plea of "not guilty" has *not* this scope in Florida as hereinbefore pointed out.

Yet, under the larger scope of the general issue in Alabama, the established doctrine is, that the defence of contributory negligence, so far from denying the material allegations of the declaration, is a plea of confession and avoidance; that it may be made out without calling in question a single allegation of the declaration; and when standing by itself admits the negligence charged in the declaration. And the court adds: "When negligence is counted on," that is the negligence of the defendant, "the fact of negligence is certainly denied by the general issue. The same words cannot at once be a denial and an admission of the same thing. The statutory general issue does not palter in a double sense."

We insist, therefore, contributory negligence is a defence which is available only under a special plea.

The statutory plea of "not guilty" in Florida puts in issue the wrongful act charged, that is, the negligence of the defendant, and the damage.

If we look to the reasoning running through a mass of discordant and divergent adjudications, it will be found that those edjudications which maintain that contributory negligence, appearing in the evidence by which plaintiff supports his case, is available to the defendant without being specially pleaded, proceed wholly upon the theory that at common law no action *at all* could lie in cases of omission or neglect of duty, where both parties were in fault *and* contributed to the injury declared on.

If this reasoning ever was sound, which we deny, when the principle upon which it rests went down under the condemnation of the Florida statute, apportioning the damages between the plaintiff and the defendant, *that* reasoning ceases to be applicable.

And this was emphasized by the statutory declaration, that when persons or things are injured, carelessness is imputed by the law to the defendant causing the injury until *he makes it appear* that he exercised due care.

We do not assail the Yniestra decision. Doubtless, it announced the correct principle *under the pleadings* in that case.

The defence of contributory negligence was set up in Yniestra's case in *three* distinct pleas, as the court will observe by turning to the transcript of the record in that case, on the files of the court, pleaded *in addition* to the plea of not guilty.

Hence it is clear the corporation in *that* case did *not* seek to avail itself, *under the plea of not guilty*, of the con-

tributory negligence of the plaintiff, adjudged to have been shown in the testimony introduced by plaintiff, as a defence to the action. That special defence was distinctly put in issue by other pleas. It was not necessary, then, for this court to determine in that case, nor did it determine that an allegation in the declaration that the defendant was negligent involved the assertion that *no* negligence on the part of the plaintiff proximately contributed to the injury of which he complains, in such sort that the plea of not guilty cast on the plaintiff the burden of showing that contributory negligence was *not* imputable to him.

Under the pleadings in the Yniestra case contributory negligence was equally and none the less *an issue* submitted for determination, whether the proof in support of it as a defence was disclosed in the evidence offered by the plaintiff or by the defendant. In the case at bar the corporation sought to avail itself of contributory negligence as a defence, *solely* under its plea of not guilty. The Yniestra case does not lend the *slightest* support to the contention in this case. In the case at bar there was no plea interposed, or sought to be interposed, raising the question of contributory negligence of the deceased as a bar, in whole or in part, to plaintiff's action.

Had such a plea been interposed, a succinct statement of the facts relied on, instead of the bare allegation "that the plaintiff's intestate was himself guilty of negligence, which proximately contributed to his alleged injury," would have been presented; and its sufficiency tested by a direct adjudication of the court.

L. & N. vs. Markee, 15 So. Rep. 513; S. C.—Ala.

If the *law* be, as insisted upon by appellant's counsel, that Section 2 of Chapter 4071, or its prototype, Section 1, Chapter 3744, defeated the "unjust and inequitable

F. C. & P. Ry. Co. v. Foxworth.—Brief of Appellee.

principle of contributory negligence," so deprecated in
21 Fla. 739, *only* in its application to cases in which the
person injured is, in his own proper person, the com-
plainant, it is clear a plea setting up facts establishing
contributory negligence, seasonably interposed, would
have presented this defensive phase of defendant's case
for the adjudication of the court upon the pleadings
where *alone* in any system of judicial administration,
which separates the functions of the court from those of
the jury, it can legally have a place.   But the appellant
did not invite the court or the jury in any way this court
may recognize to deal with *any* possible phase of defence
founded on contributory negligence; the sole issue pre-
sented was whether the act alleged in the declaration
was committed by the defendant; and if so, what dam-
ages was the plaintiff entitled to recover?

We submit the charges, and the refusals to charge,
assigned as error, on this record, must be construed in
the light of the single issue submitted to the jury; that
is, whether the corporation under the evidence was
guilty of the wrongful act alleged to have been commit-
ted, and the damages thereby inflicted.

If the charges given, whether at the request of the
plaintiff, or defendant, or by the court of its own motion,
were as favorable to the defendant corporation as it was
entitled to under the pleadings and evidence, that cor-
poration cannot complain here; even though it should
*also* appear that those charges, or some of them, were
less favorable to the corporation than might have been
given under *different* or *other* issues shaped by *differ-
ent* or other *pleadings*.

We insist the appellant here cannot impute error to
the action of the court below by injecting an issue into
the pleadings, upon which that court was not called upon

to pass; nor can it avail itself, here, of a defence of which its adversary was not apprised by its pleading in the court below.

Insisting on the foregoing views as to the pleadings, and subject thereto, we submit further that, under the laws in force, when the killing occurred and when the case was tried, a plea setting up contributory negligence on the part of the plaintiff's intestate, and which omitted the allegation that defendant was wholly free from fault, would have been demurable. Sec. 1, Ch. 4071, became operative after the killing complained of; but before the plea was filed.

This section does not purport to, and does not in fact, seek to *create* a liability against the defendant, which did not exist when the injury was committed. It is not fairly susceptible of a construction which would impute to it the legal effect of *creating* a liability which did not exist, at the time of the commission of the alleged trespass. The rule is, in applying this section to injuries theretofore committed, the court is bound so to construe it as to bring the legislative purpose into harmony with the organic law, and to give effect to the section as a constitutional enactment.

As a constitutional enactment, it creates a rule of presumption, and shifts upon the defendant the burden of making it appear, when damage to person or property occurs by the running of its locomotives or cars, or other machinery, "that their agents have exercised all ordinary and reasonable care and diligence."

That this section exhausts itself in creating a rule of presumption is manifest in that the section consists of a *single* sentence, and the concluding clause, referring to the presumption thereby created, is, "the presumption in all cases being against the company."

It was within the constitutional competency of the legislature to change an existing rule of evidence and apply the new rule to the interpretation and enforcement of past liabilities.

Indeed the argument of counsel for appellant proceeds upon the postulate that Section 2 of Chapter 4071 is substantially a reproduction of Section 1 of Chapter 3744, which last chapter is, in terms, repealed in Chapter 4071. So it is conceded, as well as clear upon constitutional principles, no change was sought to be wrought or could have been wrought as to the liability of the corporation. The change wrought was in the rule of presumption applied by the legislature in the enforcement of that liability. Recurring now to the "liability" defined by Section 1, Chapter 3744, and continued in force by Section 2, Chapter 4071, it will be observed that the first sentence in each involves a denial of liability, of *any* liability, upon the part of a railroad company, for injury done to person or property where the same is done by the consent of the party injured, or is caused by his own negligence.

It will scarcely be contended that this wholesale denial of liability is not equally efficient to protect the railroad company "where damage is done by consent of the party injured, or is caused by his own negligence," whether the suit is instituted by himself as the "complainant," or the injury resulting in death, whether the suit is instituted by the widow or husband, etc., under Ch. 3439.

Having now ascertained the meaning of the first sentence of Sec. 2, Ch. 4071, or its prototype Sec. 1, Ch. 3744, and that *its* operation and effect are *wholly independent* of the question, whether the person injured, or the husband or widow of the person injured, as the case

may be, brings the suit; upon what principle of construction can it be contended that the second sentence of the section, which makes provisions for suits for injuries where both parties to the injury are at fault, as distinguished from the provision made in the first sentence, where only the injured person is at fault, shall have an operation and effect *wholly dependent* upon the question whether the person injured, or the husband or widow of such person brings the suit?

Again: The act, Ch. 3439, providing for the recovery of damages, where the injury inflicted results in the death of the person injured, makes no distinction, whatever, between such torts as are willful; and such torts as are the result of carelessness.

As to such torts as are *willful*, resulting in injury to the person injured, not producing death, the *mere contributory negligence* of the person injured *never* was a defence. The authorities go further; although a defendant may show contributory negligence, yet the plaintiff may prove, if he can, that after the discovery of his danger, the defendant was culpably negligent in not using proper preventive efforts to avoid the injury, and upon such proof, the plaintiff shall recover, notwithstanding he may have been guilty of contributory negligence.

Railroad Co. vs. Webb, 12 So. Rep., 374.

Hurt's case.   13 So. Rep., 130; 60 Ala. 621.

So, we submit, Chapter 3439, authorizing the husband or widow of the deceased to sue for injuries afflicted, though death results, embraces in its terms not only injuries of omission, to which at common law the plea of contributory negligence was a good defence, but also injuries of commission, wanton or willful, in respect of which the plea of *mere* contributory negligence *never* was a bar.

This Chapter 3439 must be construed in the light of the existing law, its inequitable operation and the defect sought to be redressed.

The common law never gave a right of action for a trespass to the person which survived the death of the party injured; and where the wrong doing involved a felony the civil action given to the party injured *while in life* was held in abeyance and *subordinated* to the public duty of duly prosecuting the felon.

This statute changed the principle underlying *each* of these common law propositions; and its substantive effect is to prolong the right of action beyond the life of the person injured, and if the wrong done constituted a felony to divorce the right of action founded on the private wrong by whomsoever prosecuted from its subordination to the public duty of prosecuting the felon.

In "every case," says the statute, where the injured person would have been entitled to maintain the action, had death *not* ensued, the *liability* of the person or corporation inflicting the injury shall survive though the injured person dies. And the persons by whom and the order in which *this liability* may be enforced are specifically designated. The contention of the appellant is, that it is not *"in every such case"* the liability survives; but that it is only in those cases of negligence of the defendant solely, unmixed with the negligence of the person injured, that the liability survives.

The test, the *only* test, prescribed by the statute, by which the liability of the wrong-doer, whether that liability grows out of laws in force when the statute was passed, of thereafter passed, is to be determined by the question whether that liability would have existed had the party injured survived the injury. And adequate provision is made in *every* possible case for its enforce-

ment by *some one*. The statute decrees that in *no* case shall this liability die in the death of the injured person.

If the act of commission or omission complained of was such as to "*have* entitled the party injured thereby to maintain an action of damages in respect thereof," had death *not* ensued, "then and in *every* such case" the *wrong-doer* shall be liable to the action for damages notwithstanding such death.

The language of the act *forbids* any other construction. The court will observe that in fixing the liability on the wrong-doer, thus continued or kept alive "*in every case*" notwithstanding the death of the person injured, the statute does not contemplate *merely* the liability to damages incurred by the wrong-doer, under the laws in force at the time the act was passed; but looking forward it declares that if the act of commission or omission was *such*, at the time of its omission or commission, as to *have* entitled the party injured, under the law as it then existed, to bring his action for damages, then *such* liability to an action for damages shall be kept alive notwithstanding the death of the party injured. So it is clear, it is the state or condition of the law existing at the time of the injury that fixes or settles the question of the *liability* of the wrong-doer that is to be kept alive, in the purview of the statute, notwithstanding the death of the party injured.

If subsequent statutes enlarge or restrict the liability of a wrong-doer, it is this *liability*, whether restricted or enlarged by statutes in force, when the injury occurs, and none other *than this liability* that is to be kept alive.

If, therefore, Section 1, Chapter 3744, or Section 2, Chapter 4071, enlarges the liability of the wrong-doer, by giving, in terms, to the injured party added rights, or exemption from the principle of contributory negligence as

a bar to his right of action, then the former statute, Chapter 3439, maintaining its place in the statutory laws of Florida, construed as a system, still gives to the widow of the injured man, death resulting from the injury, the *right* to enforce the *liability of the wrong-doer*, which, by the terms of that statute, remains unabated, notwithstanding the death, just as her husband would *have* been entitled to enforce it, had he survived the injury.

As to the second error assigned:

The question objected to sought to test the memory of the witness. He recalled, he had said, the ringing of the bell on the morning of the accident. If there were special circumstances enabling him to recall that particular ringing on that particular morning at that particular place, as separated from other ringings, the jury was entitled to know what those circumstances were.

If his unassisted memory, by its own inherent force, was retentive enough to recall that particular ringing, its unassisted force would equally have recalled the subsequent or immediately prior ringings, unaccompanied by special circumstances, at that or other places, in the same way, and with the same tenacity. If the party against whom a witness is called is forbidden by law to subject the strength of his memory to a test before the jury, cross examinations had as well be forbidden by law.

Before discussing the other assignments of error, it is well to consider the testimony bearing directly upon the salient points.

The uncontradicted evidence establishes that the cars which were run upon the decedent were *at the time* liberated from *all* control, whether of human agency or applied machinery. The impact which propelled them is known as the "kicking back" process. The engine was precipitated upon stationary cars; and the engine was

then stopped. It was precipitated with such impact as, without further force, was necessary to move the cars along the track *through the streets of Callahan* to the point it was desired they should be arrested, and at which it was calculated they would stop, solely through the spent force of the impact, without the interposition of any agency whatever. Between the point at which this momentum was so imparted to the cars and the point at which the cars became stationary, the evidence tends to show there was no potential or other contrivance of machinery, nor human agency, to direct, control or arrest the force of this momentum; there was no force in control of this momentum or capable of application at the time of the killing.

The witness, Stewart, testified as follows:

"The train knocked him down. I didn't know who he was. I stood right there and never moved and looked at him and the train rolled right by me, and the brakes caught him and drug him about thirty feet or more."

Q. What was he doing?

A. He looked like he was struggling all the while.

Q. How? Tell the jury.

A. When the train struck him he fell right on his face, and looked like he tried to get up.

Q. What was he doing to get up?

A. He made a step; tried to draw up his feet, but the train was going too fast and he could not do it. As he fell he threw his hands out and the train cut off one of his hands, and then he laid right there and the brakes caught him and drug him along.

Q. The brakes caught him as he was struggling to get up in front of the brakes?

A. Yes.

Q. Well, go on.

A. No one was standing on the end of the train to look.

Q. What warning was given that the train was going backwards?

A. None at all.

Q. State whether it went back rapidly or slowly.

A. Went back pretty rapidly. The engine shoved pretty hard and sent it back and stopped.

Q. The engine stopped?

A. Yes.

Q. Do you know anything about railroad trains? You call that "kicking back?"

A. Yes. Call it kicking back. She gave it a shove and then stopped still.

Q. Now state whether from a position at the rear end of that car, the track is open to a man on the rear end of the car, in the direction it was going? Is it clear?

A. Yes.

Q. Perfectly clear?

A. Yes.

Q. There was nothing to obstruct the sight of Mr. Foxworth from the rear end of the car?

A. Nothing at all.

Mr. Barrs testified:

"He (Mr. Foxworth) was standing" when witness saw him, "right in the middle of the track, with his right hand on the car bumper or draw head, and holding his umbrella with his left hand and holding on to the car with his right hand."

Q. That is the first time you saw him?

A. Yes.

Q. Tell it to the jury.

A. The car was backing and he held on there and was struggling to make his way up to the car. He was

standing in a position behind the car as it was backing and struggled a few times. During the time he was there it came back about thirty feet, and then he fell parallel with the cars and went under the cars and three coaches run over him.

The witness further spoke of his grasping something, "some of the rods or railing of the platform of the rear car," and continued: "I saw him about the time the cars struck him. He was going across the road. After starting I was in full view of Foxworth and the rear end of the cars when he was struck."

Q. Now your attention was attracted to the rear car and also to Mr. Foxworth struggling. At that time, was there any brakeman at the rear end?

A. I saw none.

Q. Was your attention attracted to that point?

A. Yes.

Q. Suppose one had been there, could he have rendered assistance?

A. He certainly could. He could have caught hold of him and supported him until the car stopped.

To rebut this evidence, the defendant introduced the man it claimed was on the rear end of the backing car that struck deceased.

Q. What did you do on the rear end?

A. I looked to see if the track was clear—looked the way we were going.

Q. At what rate of speed were you going?

A. About four miles an hour.

Q. How long did you continue to look and where was the rear end of the train when you ceased to look?

A. About a car's length from the crossing.

Q. Which way from the crossing?

A. South.

Q. Before you reached the crossing, or after?

A. After.

Q. You continued to look that way until after you passed the crossing about a car's length?

A. Yes.

Q. Do you know when Mr. Foxworth was struck with the train?

A. It was afterwards.

It is clear, then, if the employee, who was put, as the appellant alleges, on the rear end of the train to maintain a lookout or to put on brakes as the cars were thus propelled through the main thoroughfare of Callahan, is to be believed, there was no one *on the look out* when the accident happened.

But this employee, witness of the appellant, was between the devil and the deep blue sea.

The examination of this unhappy man thus proceeds.

Q. How far was it from where you ceased to look that the train struck him?

A. I could not tell.

But the corporation was unhappy now, so it inquires:

Q. About how far?

A. About five or ten feet.

Q. And what was the interval of time?

A. It could not consume more than four or five seconds.

Q. Tell me when you first saw Mr. Foxworth?

A. *After* the cars had run over him.

Q. You did not see him at all prior to that?

A. No.

Q. You did not see him get on the track?

A. No.

Under the theory this corporation entertained of this

defence, it was necessary to show there was a brakeman on the rear end of the car as it was propelled through this thoroughfare.

And the brakeman swears, in all dutiful fealty, *he was there*.

The plaintiff had established, by the mouth of an uncontradicted and an unimpeached witness, that in view of the time consumed in his struggling after the car had struck him, there was nothing to prevent a brakeman in his place on this rear end from stretching forth his hand and plucking the stricken man from the death he died. In this exigency, it was necessary for the appellant to make it appear that this sober, proper employee was then and there at the brakes, and on the lookout; but the testimony of this alleged sober, efficient brakeman, shows that, having eyes to see and hands to save the struggling man, and ears to hear his distressful cry, his eyes were holden and his ears were stopped and his saving hands were stayed for *just that interval of only five or ten seconds*.

But the jury believed not this wonderful holding of eyes and stopping of ears and staying of hands; they accepted the testimony of Stewart and other witnesses that he was not there at all at the time of the accident.

Had he been *there* where the duty of the corporation to the public required he should be, with unstopped ears and unclosed eyes and outstretched hands, the uncontradicted and unimpeached testimony is, the struggling man, summoning, as he did, in those supreme moments, the energies which desperation alone may inspire, in this fateful wrestling with the uncontrolled momentum of these cars, would have been saved.

As to the third error assigned:

If this instruction, standing alone, might be fairly claimed to have misled the jury, which is denied; yet,

when read or understood in connection with the other instructions, as the jury must have understood them, the instructions as a whole contain a fair exposition of the law, no reversible error has been committed.

Lincoln vs. Power, 151 U. S., 440.

In 21 Florida, 737, cited by appellant to support its contention, on this assignment of error, the Chief Justice, at the January term, 1886, said: "I feel constrained to say in conclusion that in my opinion, and speaking for myself individually, the operation of the principle of contributory negligence is unjust and inequitable."

In June, 1887, Chapter 3744, the legislature changed this "unjust and inequitable principle of contributory negligence" by establishing the right of recovery in, and diminishing the amount thereof in proportion to the amount of default attributable to, the injured person; and in terms, *left it to the jury* to make the apportionment. And so it is, if the reasoning of the court in that case, wholly divergent in its facts, lends the slightest support to the contention of the appellant, which is denied, that reasoning is no longer applicable.

And Section 1, Chapter 4071, enacted 4, 1891, recognizes and enforces, as a rule of evidence, in furtherance of a wise public policy, the presumption that in damages done to a person by the running of locomotives or cars, the company have not "exercised all ordinary and reasonable care and diligence."

But this charge is not amenable to the criticism which assails it. It assumes no fact; it gives no improper definition of gross negligence; it is postulated on a state of facts, which the evidence tends to prove, and is sustained by the authorities.

Cooper vs. Lake S. & M. S. R. Co., 33 N. W. Rep., 306; S. C. 66 Mich. 261.

As to the fourth assignment of error:

This is predicated on the second charge, numbered third, as stated in the brief of appellant's counsel.

It is not stated therein, as appellant's counsel argue, "that any neglect or precaution constitutes negligence." The charge is predicated only of such precautions as are proper in the circumstances of the surroundings. Nor is it abstract. It is sustained by the authorities.

N. & W. R. R. Co. vs. Burge, 4 S. E. Rep., 21; S. C. 84 Va. 63.

As to the fifth assignment of error:

This charge is sustained in N. & W. R. R. Co. vs. Burge, 4 S. E. Rep., 21; S. C. 84 Va. 63.

It assumes no fact. If counsel for appellant wanted a specific definition as to what constituted *timely* notice, it was his privilege to ask for it; and, if in response thereto, no charge had been given, or one given wanting in fullness, as he viewed the matter, to interpose a seasonable exception.

As to the 6th assignment of error:

The charge criticised is sustained by Burge's case, and the authorities therein cited to its support. The failure of the person injured to look and listen does not *bar* plaintiff's right of recovery, even if such failure should operate to *reduce* the amount recovered.

As to the 7th, 10th and 11th assignments of error:

These are based upon the alleged elements of damages which entered into the verdict for $25,000.00 but which are not shown to have entered into the final judgment appealed from, and have been heretofore discussed. The language of the act Chapter 3439, section 2, is, "and in every such action the jury shall give such damages as the party or parties entitled to sue may have sustained by reason of the death of the party killed." The insistence

of appellant is that these damages are confined to the *pecuniary* loss the plaintiff sustained by the death of her husband, "estimated by the husband's probable future earnings and his ability to care for the plaintiff."

This rule or method of estimation, laid down by appellant is conspicuously inexact and impracticable of application. What kind of probable future earnings; what degree and kind of care is to tax his "ability to care for the plaintiff." A dutiful husband's care of his wife is exercised, primarily, in extending to her as her wifely dues, the society, comfort and protection of his presence.

In California, the statute provided for "such damages, as under all the circumstances may be just." It was held a mother may recover for loss of her son's society, comfort, support and protection; but not for her grief, sorrow and mental suffering.

Munroe vs. Pac. Coast, 24 Pac. Rep., 303; S. C., 84 Cal., 515.

In a previous case, Cleary vs. City R. R., 18 Pac. Rep., 269; S. C., 76 Cal., 240, under the same statute, it was held that the mental anguish and suffering of a *parent* was to be considered.

Assuredly, "such damages as the party entitled to sue may have sustained" cannot be regarded as *more* restricted than "such damages as under all the circumstances *may be just.*"

The *terms* of Lord CAMPBELL's Act, by force of which the measure of damages accruing from the death of the injured person to the persons therein designated is estimated, render wholly inapplicable to our statute the reasoning employed by the courts in the interpretation of the British act.

The subject-matter of our statute is *not* "compensation for injury by reason of the relative not being in life,"

adjudged in Dalton vs. R'way Co., 4 C. B. (N. S.) 296, to be the subject-matter of the CAMPBELL Act.

This cannot be "the subject-matter" of our statute, seeing the liability of the wrong-doer may be enforced by the administrator or executor of the person killed, in the absence of other persons specially designated in the statute. Assuredly the executor or administrator of the person killed, that is, one who may be and often is an entire stranger to the deceased in blood and estate, cannot with legal or other propriety be said to have sustained in his own person damages through the act of the wrong-doer in killing the deceased "*by reason* of the relative not being in life." Assuredly, the *only* damages, such as an executor or administrator could sustain, fall to him, exclusively, in his representative relation to the *assets* of the deceased; and the only possible damages, he could enforce, is in virtue of the right of action, as a property right, which would have accrued to his decedent, had he survived the injury, thus transferred to him as such representative.

This is further manifest in considering the title of the Florida act. It differs wholly from the title of Lord CAMPBELL'S Act, the title of the latter being "An Act for compensating the families of persons killed;" whereas the title of the Florida act is "An Act fixing the liability of persons and corporations for damages resulting from the death," etc.; and the fixation of this liability is accomplished, not by creating a *new action*, but by keeping *alive* the liability of the wrong-doer, just as if the victim had not died; whereas the terms of Lord CAMPBELL'S Act were such as to force the construction that its operation and legal effect was to give a *new* action; and *not* to *transfer* to the representative of the deceased the

right of action which the deceased would have had, had he survived the injury.

It would seem, therefore, the contention of the appellant that the Florida statute must receive the construction placed by the courts on Lord CAMPBELL's Act is wholly untenable. The title and terms and substance of Chapter 3439 indicate the purpose of its framers, by departing from the title, terms and substance of Lord CAMPBELL's Act, to exclude, industriously, the construction which they were advised had been put upon the latter act.

The seeming conflict and confusion, found in the adjudged cases, have arisen in part from the differing phraseology of the statutes on the subject. The true construction of our statute, we submit, ascertaining its meaning from the entire context and the evident purpose manifested by the legislature to keep *alive* and *enforce* the *liability* of the *wrong-doer notwithstanding* the death of the injured person, requires the application of the same rule and measure of damages when death ensues from the injury, as when the party injured escapes death, and sues in his own name.

Since we received appellant's brief, and since writing the foregoing, the case of Duval vs. Hunt, 34 Fla. 85, has been decided by the court.

Our contention, that the defense of contributory negligence should be made not on the general issue of not guilty, but by special plea setting up the facts supposed to constitute negligence, finds strong analogical reasoning in the Hunt case to sustain it. Criticising the declaration in *that* case as entirely insufficient, had it been demurred to, in alleging negligence charged against the defendant, this court says: "While it is not necessary in a declaration to set out in minute detail all the facts that

tend to establish the negligence complained of, yet it is requisite in all cases of this kind to allege facts sufficient to point out the wrongful act of omission or commission that constitutes the negligence relied on for recovery, in order that the defendant may know what he is called upon to answer, and that the court may be able to say, upon the pleadings, whether that which is set up and relied on as negligence constitutes negligence in law."

It is equally, and for the same reason, necessary when negligence is relied upon to defend the action, that the facts which are relied upon to constitute it, should be stated in a plea to be filed for that purpose, in order that the plaintiff may be advised what he is called upon to reply to, and equally and alike necessary that the court may be able to say, upon the pleadings, whether that which is set up and relied on as negligence constitutes negligence in law.

This must be so, unless the appellant is able to show the court there is one rule of pleading, as to the facts required to constitute negligence when set up by the plaintiff, and another and different rule of pleading as to the facts required to constitute negligence when set up by the defendant.

Assuredly the *science* of pleading, which vaunteth itself because of the singleness and certainty of the issue, whether of law or fact, which, if its rules are adhered to, must be developed in the mutual altercations of the parties, does not admit of any such distinction.

But to apply, by paraphrase, the language of this court in the Hunt case to the case at bar; that is, if the appellant succeeds in establishing the defense of contributory negligence without pleading it, it would seem, "so far as the negligence of the plaintiff is concerned, the defendant seems to have postponed the *allegata* of the

case to be evolved with the *probata* thereof, out of the evidence submitted at the trial."

In the Hunt case, the defense sustained by the court, the contributory negligence of the injured employee, was specially pleaded.

A review of the Hunt case, and of the points therein *presented* for decision and *actually* adjudicated, becomes justifiable, in view of the importance the appellant in this case, as its counsel tell us, attaches to it.

We submit that it was necessary in the Hunt case for this court to determine—

1. The question as to the parties in whom our statute, Chapter 3439, vested the right of action for death by wrongful act or negligence; and it determined it—second and third headnotes.

2. That it was necessary to determine, and this court did determine, no recovery can be had under this statute, unless the wrongful act, carelessness of default was such as would have entitled the deceased person to a recovery of damages, had death not ensued.

3. That no employee of a railroad company can recover damages for injuries sustained by him on account of the negligence or carelessness of another employee, unless *wholly* without fault himself.

And the court, upon the adjudication of these propositions, further ascertained that Hunt, the deceased, was an employee of the company, and was injured in using defective or dangerous tools and appliances with such knowledge of their dangerous and defective character as denied him the status of being "wholly without fault."

In passing upon the third proposition quoted, this court in the Hunt case was required to determine and did determine, that the Florida act made no change whatever as to the "*factum*" of the liability of the wrong-doer,

death resulting, for damages in respect of the injury sustained. That, as to *this* liability, thus kept alive, it made no difference in *ascertaining* its existence, as a matter of law, or in enforcing it, as matter of fact, whether the party surviving the injury brought the suit, or whether the party injured dying, one of the several parties, succeeding under the statute to the right to enforce this liability, brought the suit. The reasoning of this court, in establishing this proposition in the Hunt case, makes it clear that the injury, upon which the claim to damages is based, is the injury to the victim of the injury, whether he survives or dies; and that the liability of the wrong-doer, if it exists, must be determined by the act complained of, and the default, negligence or carelessness of the wrong-doer, ascertained *solely* by the relation of the *injured*, and *not* the parties bringing the suit if death result, to the wrong-doer.

- This reasoning is not in harmony with the proposition that the existence, ascertainment, measure or enforcement of this liability is in the *slightest* degree dependent upon the wholly accidental relation, the injured party dying, the persons authorized by the statute to sue may have to the *wrong-doer*, or to the *injury inflicted*.

Suppose, in the instant case, the statute had cast the *right* to sue upon one of the employes of the corporation, through whose act, default, negligence or carelessness the injury was inflicted, can it be contended that this accidental relation of the plaintiff, thus vested with the right to sue to the defendant wrong-doer defeats or impairs the liability of the defendant for the wrong done?

As the three propositions quoted were necessary to be determined, and were vital, precluding *any* recovery whatever by the Hunt family or either of them, their adjudication disposed of that case, and must be, and are,

accepted by us as adjudicated propositions. But, as under these adjudications, applied to the ascertained facts upon that record, no party to that record could in any event recover *any* damages because of the death of the deceased Hunt, the consideration bestowed, in that case, by the court upon the question of the *measure* of damages accruing to a party entitled to recover, was wholly abstract, and however valuable for the force of its reasoning, is not controlling as an adjudication in the conclusion reached as the result of it, expressed in the eleventh and twelfth headnotes. Carroll vs. Carroll, 16 How. U. S. 287.

In disposing of the question of parties in the Hunt case, the Supreme Court also repudiates the contention of appellant, in this case, that Section 1, Chapter 3744, is confined to cases wherein the injured is the party plaintiff.

In determining the proposition, numbered above as 2, this court was forced to adjudicate that the Florida act was unlike Lord CAMPBELL's Act. The Florida act creates no *new* right of action, vested in the parties, and in the order therein designated, proceeding on *different* principles. It simply keeps *alive* the original right of action, makes it maintainable *only* when the *deceased*, if death had not intervened, could have maintained it, and indicates to whom this right of action *survives*. The title of the act, which guided Justice COLERIDGE, Blake vs. Railway Co., 18 Q. B., 93, in interpreting Lord CAMPBELL's Act, does not justify the conclusion that the Florida act is "An Act for compensating the families of persons killed." Nor is the subject-matter of the Florida statute "compensation for injury by reason of the relative not being alive," as was the subject-matter of the

English act, as interpreted by Mr. Justice WILLIS in Dalton vs. Railroad Co., 4 C. B. (N. S.), 296.

But the *liability* being merely *continued*, no recovery can be had, unless the wrongful act, carelessness or default be such as would have entitled the victim of the injury to damages, had he survived; therefore, the measure of damages must be the *loss or suffering of the injured party*, determined upon the same principles, and subject to precisely the same limitations, had he survived the injury, in respect of the default, carelessness or negligence in producing which damages are allowed, and brought the suit.

We submit the language of the Florida act makes this plain. When "the act, negligence, carelessness or default is such as would, if *death had not ensued*, have entitled the party *injured thereby* to maintain an action for damages in respect *thereof*"—that is, "of the act, negligence, carelessness or default"—"then, and in every such case," the person who, or corporation which, would have been liable in damages if death had not ensued, shall be liable to an action for *damages*."

This act clearly *fixes* the liability of the *person* or *corporation* doing the injury for the damages, notwithstanding the killing, and ascertains who may enforce this liability—the whole liability so "fixed" by the statute—and also makes it clear this liability is to be enforced by a *single action*, exclusively; not by a succession of actions. Whoever sues, the liability so "fixed" is ascertained by that suit, and the person or corporation upon whom this liability is so fixed by suit is discharged by the payment of that ascertained liability.

It is clear the liability of the wrong-doer for damages sustained by the injured party is *fixed* by the first section of the act.

Nor is there anything in the second section of the act which varies this liability of the wrong-doer, *thus fixed*, because of the character, whether of relationship, dependence, or what not, of the person suing to the person killed.

The second section does not concern itself with the *amount* of the recovery in enforcing the liability of the wrong-doer, as fixed in the first section. That section simply indicates the party, or parties, who are to sue, and the order in which they are vested with the right as parties, to enforce the liability of the wrong-doer, kept in force notwithstanding the death of the injured party; and requires the jury to "give such damages as the party or parties entitled to sue may have sustained by reason of the death of the party killed." This last requisition is not a limitation upon the right to recover, or upon the amount. No damages *whatever* have accrued to any person *whomsoever*, other than the injured, by the mere fact of death. The whole purpose, scope and meaning of the act forbids the construction that recoverable civil damages have been *incurred* by the *wrong-doer* by reason of the *death* of the party killed. Its whole scope, purpose and spirit were to *prolong* the liability of the wrong-doer to an action of damages to the victim of his injuries, in respect *thereof*, inflicted by the act, carelessness, negligence or default of the wrong-doer, not because of, *but notwithstanding* the injuries resulted in, the death of the party injured. Nor is there the slightest suggestion in the act that the liability of the wrong-doer, in respect of the damages, *fixed* by the 1st section, growing out of his default, carelessness or negligence, shall be greater or less because, one person and not another, is entitled to bring the action.

Irrespective of who sues, the wrong-doer is only re-

sponsible for damages that he would have incurred if the party injured though reduced to physical helplessness had survived; that death ensues does not enter as a factor, in determining whether the injury complained of was the result of the default, negligence or carelessness of the wrong-doer. Nor does *that* mere fact in any way add to the default, negligence or carelessness of the alleged wrong-doer, or his *culpability*, in a civil action, as matter of law; nor does it detract from the amount of damages for which he would be legally liable, had his victim, though physically disabled, survived.

The measure of damages, in any case, by whomsoever the action is brought, is determined by the carelessness, negligence or default of the wrong-doer, creating the injury resulting in death, notwithstanding death ensues. Subject the text of the act to a more rigorous analysis. What fixes the liability of the defendant wrong-doer? It is "the wrongful act, negligence, carelessness or default" of the wrong-doer. Upon whom is the injury inflicted? The person killed, who suffers the loss or injury. In respect of *what* may the action be sustained? In respect of the act, carelessness, negligence or default of the wrong-doer, causing the injury *to the person injured.* By whom may the action be maintained? By the person (1) suffering the loss or damage, in respect of such act, or default; (2) if the injury result in death, then notwithstanding, in *spite of*, not in consequence of, such death, by certain persons designated in the statute. For *what* damages is the suit to be brought? For the *same* damages, and none other, in respect of the *same* act, default or negligence, and *none* other, for which the party injured, had he survived, could have maintained his action for damages. The injured party dying, the damages sued for are the same damages accruing by

force of the statute to the parties vested with a representative relation to the rights of the victim.

For what damages could the injured party, had he survived, maintained his action? Certainly he would not have been confined to pecuniary damages, such damages as are pecuniary and actual, as distinguished from exemplary. Our statute makes no distinction, as to the damages sued for, whether the party injured sues, or that party dying, suit is brought by the parties in whose favor the liability of the wrong-doer is continued, notwithstanding the death of the party injured. Nor does our statute proceed on the idea that the distributees of such damages, to be recovered by action, had been deprived of the benefits to be derived from the continued life of the victim of the wrongful injury.

As to the precise point under discussion, the Florida statute, in its essential features, is like the Virginia statute of 1871. In Matthews v. Warner, 29 Grat. 570; S. C. 26 Am. Rep. 396, speaking to this statute, the court says: "The statute of New York, and all the other States, modeled upon the English statute, are found to be in the following terms, or those of like report: The jury may give such damages as they may deem fair and just compensation (not exceeding a specified sum) with reference to the *pecuniary* injuries resulting from such death to the parent next of kin," etc., etc. In our statute, instead of these words, or words of like import, being employed, it is declared that "the jury in any such action may award such damages *as to it may seem fair and just,*" etc., etc. Certainly, in the Virginia statute there are no words of limitation as in the English statute, and those modeled thereon, confining the jury in the assessment of damages to merely pecuniary injury; but, by the very terms of the statute, the damages are such

"as to the jury may seem fair and just." Affirmed and applied in Turner v. Norfolk, &c. R. R., 40 W. Va. 675, 22 S. E. Rep. 83. There are no words of limitation, whatever, in the Florida statute.

But suppose this court adheres to the views expressed in the Hunt case, and these views be applied to the facts in this case, let us follow them out to their logical conclusion. "The plain meaning of the statute," says the court, page 111, "is that the damages to be awarded are such only as will compensate the beneficiaries of the action for the loss resulting to them from the death." It follows, therefore, the wife surviving is entitled to compensation, in respect of her deprivation of these things, which were hers, as matters of law, her husband living. Petrie v. Columbia R. Co., 29 S. C. 303, 7 S. E. Rep. 520; Strother v. S. C. R. Co., 47 S. C. 375, 25 S. E. Rep. 272.

It can scarcely be doubted that the wife has a valid *legal* claim, the husband living, upon him for his love, and loyalty as husband, for the society, comfort and protection of his presence in his relation to her as husband, as she has for the means of physical subsistence, clothing, food and shelter. The marriage relation is not a relation based *merely* upon contract, wherein the reciprocal rights of the parties may be enforced, and the wrongs therein redressed, as in a contract to build a house, or perform domestic labor or other service. Nor are the rights accruing upon a Christian marriage *mere property* rights. It is an *institution*, as much so as *property*. "The chief supports of social order are the two institutions of *property* and *marriage*; property, whereby man securely enjoys the fruits of his pains-taking labor; and marriage, whereby the society of the sexes is so wisely ordered as to make it a school of the kind affec-

tions and a fit nursery for the commonwealth." The *duties* of the husband, and the reciprocal *legal* rights of the wife, independently of mere property rights, are expressed says Prof. Minor, Vol. 1 Minor's Institutes, 284, subs. 1h, in his marriage vow—"namely, to 'love her, comfort her, honor and keep her, in sickness and in health, and, forsaking all others, to keep only unto her as long as they both shall live.' "

The marriage contract makes the parties *one*; not the *unity* created by a commercial partnership, organized for pecuniary gain, but the *oneness* which secures the woman an indissoluble companionship with her husband, the comforts, endearments, and protection of his presence, as her legal *wifely* rights. It was a marriage *institution*, not a *commercial* partnership, our Savior beautified and sanctified by His presence at its solemnization!

Chancellor JOHNSON, 1 Spears Eq. 569, (S. Car.) S. C. 42 Am. Dec. 332, affirmed the annulment of a marriage, where he found no other motive on the part of the woman, taking advantage of the man's weak intellect, entering into it than the expectation of securing worldly gain to herself.

Will this court hold that the *only* basis of compensation to a widow whose husband is killed by a wrongdoer is the expectation of pecuniary advantage to her in his continuance in life?

Now, to repeat the language of this court, the damages to be awarded her are such as will compensate her for the loss resulting from the death of her husband. "The jury," says the statute, "*shall* give such damages" as she "may have sustained by reason of the death of the party killed."

But, urges the appellant, he was old and poor, and besides was merely an itinerant Methodist preacher—

circuit rider—dependent upon a few scattered churches for support; and therefore, though the appellant did by its wrongful act crush the life out of him, it ought not to pay his widow much if anything for it.

Were these wifely legal dues, of which she was thus deprived, the society, comfort and protection of his presence, less dear to her, less a deprivation, now that he has been taken away, because he was old and poor, and a Methodist circuit rider at that?

Suppose this was *all*, absolutely *all*, the wife received from her husband. Nor lands, nor money, nor raiment, nor support of any kind did the husband bring unto her —naught else than the comfort, and society and protection of his presence did her husband bestow, was he able to bestow upon her. Suppose all this had been established by the evidence?

It is evident the widow, the only person in existence who *can* sue the wrong-doer, can receive nothing, under the view pressed upon the court, because her husband's life, rich in all things else, was of no pecuniary benefit to her.

In this view the title of the act, "An Act fixing the liability of persons and corporations resulting from the death of any one caused by the wrongful act, negligence, carelessness or default of such persons or corporations, or the agents thereof," is wholly misleading.

Provision is not made for damages resulting from the death of *any one*; provision is only made for the death of such an one whose continuance in life is of pecuniary benefit to others.

So far from any liability being *fixed* by this act, it is absolutely *unfixed* by this construction, as to all whose continuance in life is of no pecuniary benefit to others. As to this class, it is to the interest of the wrong-doer

that the injury he wrongfully inflicts should always result in death, seeing in that event he is absolutely discharged from civil responsibility.

CARTER, J.:

I. While we do not commend the practice, we think it is permissible in common law pleading to refer to, and thereby make a part of one count, the whole or a part of the allegations of another count in the same declaration. To be effective, however, the reference should be definite and certain· 1 Chitty's Pleadings (16th ed.), p. 429; Dent's Admr. v. Scott, 3 H. & J. (Md.) 28; Freeland v. McCullough, 1 Den. (N. Y.) 414, S. C. 43 Am. Dec. 685; Crookshank v. Gray, 20 Johns. (N. Y.) 344. This rule being fully complied with in this case, the first assignment of error fails·

II. The question propounded to the witness Dean was objected to in the trial court upon one ground only; that it was in form argumentative. In this court it is argued that the question was objectionable because it sought to obtain a mere opinion from the witness. We can not consider this objection because we are confined to those insisted upon in the trial court. Tuten v. Gazan, 18 Fla. 751; Jacksonville, Tampa & Key West Ry. Co. v. Peninsular Land. T. & M. Co., 27 Fla. 1, 9 South. Rep. 661. It is not suggested by appellant in what respect the question is argumentative, nor do we perceive that it is, consequently the second assignment of error is not well taken.

III. In considering other assignments of error it will be necessary for us to determine whether, in this case, contributory negligence on the part of the deceased will operate as a bar to plaintiff's recovery, or merely in

diminution or reduction of damages. In Louisville & Nashville R. R. Co. v. Yniestra, 21 Fla. 700, it was held that, by the common law, a plaintiff could not recover damages for personal injuries caused by the joint negligence of himself and the defendant; that in such cases plaintiff could not recover upon proof that the injuries were essentially caused by the negligence of a defendant; but only by showing that his own negligence did not contribute in any degree to produce the injury received by him. The same principle was stated and applied in Florida Southern Ry. Co. v. Hurst, 30 Fla. 1, 11 South. Rep. 506. In the former case the Chief Justice suggested that this rule was inequitable and unjust, and that legislation was needed apportioning the damages where the negligence of the plaintiff and the defendant both contributed to the injury. At the next session of the legislature this suggestion was acted upon, and Chap. 3744, approved June 7, 1887, entitled "An Act to apportion the damages in actions against railway companies by persons and employes, and to provide for such recovery of damages against said railway company by its employes," was enacted, whereby in section 1 it was provided: "That no person shall recover damages from a railroad company for injury to himself or his property when the same is done by his consent, or is caused by his own negligence. If the complainant and the agents of the company are both at fault, the former may recover but the damages shall be diminished by the jury trying the case in proportion to the amount of default attributable to him." Chap. 4071, entitled "An Act defining the liabilities of railroad companies in certain cases," approved May 4, 1891, provides by section 2, that "no person shall recover damages from a railroad company for injury to himself or his property where the same is done

by his consent, or is caused by his own negligence. If the complainant and the agents of the company are both at fault, the former may recover, but the damages shall be diminished or increased by the jury in proportion to the amount of default attributable to him," and, by section 4, "that Chap. 3744, Laws of Florida, approved June 7, 1887, be and the same is hereby repealed." This suit was instituted April 23, 1891, by a widow to recover damages for the alleged negligent homicide of her husband in December, 1890, and the trial was had in November, 1891. Chap. 3439, approved February 28, 1883, authorizing suits of this character to be brought, is entitled "An Act fixing the liability of persons and corporations for damages resulting from the death of any one, caused by the wrongful act, negligence, carelessness or default of such persons or corporations, or the agents thereof," and provides, in section 1, that "whenever the death of any person in this State shall be caused by the wrongful act, negligence, carelessness or default of any individual or individuals, or by the wrongful act, negligence, carelessness or default of any corporation, or by the wrongful act, negligence, carelessness or default of any agent of any corporation when acting in his capacity of agent of such corporation, and the act, negligence, carelessness or default is such as would, if death had not ensued, have entitled the party injured thereby to maintain an action for damages in respect thereof, then, and in every such case, the person or persons who, or corporation which, would have been liable in damages, if death had not ensued, shall be liable to an action for damages, notwithstanding the death shall have been caused, under such circumstances as make it in law, amount to a felony;" and, in section 2, "every such action shall be brought by and in the name of the widow

or husband, as the case may be, and where there is neither a widow or husband surviving the deceased, then the minor child or children may maintain an action; and where there is neither a widow or husband, or minor child or children, then the action may be maintained by any person or persons dependent on such person killed for a support, and where there is neither of the above class of persons to sue, then the action may be maintained by the executor or administrator, as the case may be, of the person so killed; and in every such action the jury shall give such damages as the party or parties entitled to sue may have sustained by reason of the death of the party killed; provided, that any action instituted under this act by or in behalf of a person or persons under twenty-one years of age, shall be brought by and in the name of a next friend."

It is here contended, 1st, that neither the provisions of section 1, Chap. 3744, nor of section 2, Chap. 4071, apply to this case, because they by express terms are applicable only to cases where the injured party is himself the plaintiff, and have no reference to cases where death has ensued and other parties are maintaining the action. It is admitted, however, that if death had not ensued, and the action was being maintained by plaintiff's husband, his contributory negligence, unless it was the sole proximate cause of his injury, would not bar his right of action since the enactment of these statutes, but would require the reduction or diminution of the damages to be recovered by him. As these statutes declare and limit the right of the deceased, had he lived, to recover damages for the injuries received by him, it is clear that they apply to actions brought by the widow under the provisions of Chap. 3439, because she is thereby authorized to maintain an action only where the wrong-

ful "act, negligence, carelessness or default is such, as would, if death had not ensued, have entitled the party injured thereby to maintain an action for damages in respect thereof." Duval v. Hunt, 34 Fla. 85, 15 South. Rep. 876. 2nd. That Chap. 3744 was expressy repealed by Chap. 4071, which became effective after the injury to plaintiff's husband, but before the trial in the Circuit Court. It is admitted by counsel for appellant that the language of section 1, Chap. 3744, is identical with that of section 2, Chap. 4071. This is not literally true, as will be observed by a comparison of the two sections, but we think that Chap. 4071, which expressly repeals Chap. 3744, re-enacts substantially the provisions of section 1 of the latter act, and under a well-settled rule of construction, the provisions of that section are not thereby destroyed or interrupted in their operation, but continue in full force. Forbes v. Board of Health of Escambia Co., 27 Fla. 189, 9 South. Rep. 446.

IV. It is urged that the first instruction given at plaintiff's request was erroneous, because, 1st, the use of the term "gross negligence" meant that the conduct of defendant in doing the acts constituting the "gross negligence" defined were wanton and reckless, and that the injury was occasioned by the sole negligence or fault of the defendant, and was, therefore, inapplicable to any evidence in the case. In other charges given by the court to the jury they were instructed not to give plaintiff exemplary damages, and that they must apportion the damages, in case they found contributory negligence on the part of plaintiff's intestate; from which it was clearly made to appear to the jury that the term was not used in the sense claimed by appellant. In Florida Southern Ry. Co. v. Hurst, 30 Fla. 1, 11 South. Rep. 506, we held that the use of the expression "gross negli-

gence," in a charge to a jury, does not of itself define, nor does it include, only that extreme degree of negligence which is wanton or reckless of its injurious consequences, and to which the defense of contributory negligence does not obtain and can not be held as having been intended to submit the case to a jury for consideration as one of that character, and particularly so where other charges have recognized contributory negligence as a defense to the action.  2nd. It is also insisted that the charge assumes certain facts as proven, which were disputed in evidence, *viz*: that there was no brakeman on the rear of the train; no flagman at the crossing, and that the train was backing across the main thoroughfare of a village.  We do not think the charge is subject to that construction.  It merely asserts an abstract legal proposition, without attempting to apply it to the facts of the particular case on trial, leaving it to the jury to make the application to the facts as found by them. There was evidence tending to show that there was no brakeman on the rear of the train, nor flagman at the crossing, and that the train was backing across the main thoroughfare of a village, but no intimation from the court that this evidence was true, or that these facts were proven.  3rd. It is admitted that the proposition of law asserted in the charge is correct, but criticised as being inapplicable to the evidence in the case on trial. Giving to the word "gross" the meaning before stated, we think the charge was substantially correct as a legal proposition.  The principle, in almost identical language, was held in Cooper v. Lake Shore & M. S. Ry. Co., 66 Mich. 261, 33 N. W. Rep. 306, to be correct; it finds some support in Florida Central & Peninsular R. R Co. v. Williams, 37 Fla. 406, text 425, 20 South. Rep. 558, and the principle is sustained by many authorities.

2 Wood on Railroads, §323; 3 Lawson's Rights, Reme-
dies & Practice, §1187; 2 Shearman & Redfield on Neg-
ligence, §471; Patterson's Railway Accident Law, §171;
Kentucky Central Railway Co. v. Smith, 93 Ky. 449,
20 S. W. Rep. 392, 18 L. R. A. 63 and note; Beach on
Contributory Negligence, §194. And we think the
charge was applicable to the evidence in the case. There
was testimony that the deceased was struck by a back-
ing train while attempting to cross defendant's track laid
in and along the only prominent street in the village of
Callahan, within a few feet of, and practically at, a public
crossing; that the train was running at a speed of at
least five miles an hour; that the engine bell was not
rung, no flagman stationed at the crossing, nor lookout
upon the rear of the train, and that the backing cars
were cut loose from the engine before the collision.

V. The third instruction for plaintiff also contained a
correct abstract proposition, and the court did not err in
giving it. It has been approved in Norfolk & Western
R. R. Co. v. Burge, 84 Va. 63, 4 S. E. Rep. 21, and the
same principle is substantially stated in Florida Central
& Peninsular R. R. Co. v. Williams, 37 Fla. 406, 20
South. Rep. 558, in the following language: "Where
steam railroads are laid and operated along or across the
streets of populous towns or communities where numer-
ous people of all conditions and descriptions are aggre-
gated or likely to be, it is their duty to operate the dan-
gerous implements used by them with the utmost de-
gree of care, strictly commensurate with the circum-
stances by which they are there surrounded, in order to
avoid injury to others." We do not appreciate the force
of appellant's contention that it is exempt from the prin-
ciples of law embraced in these instructions, because its
road was in operation before the village came into ex-

istence. Its duty in respect to operating its trains is necessarily dictated and measured by the exigencies of the occasion, or in the light of the condition of things at the place where, and time when, the accident happened. Bucki v. Cone, 25 Fla. 1, 6 South. Rep. 160; Florida Central & Peninsular R. R. Co. v. Williams, 37 Fla. 406, 20 South. Rep. 558. The building up of a town along and on its line, causing the operation of its road to be attended with greater danger to others, imposed a duty upon appellant to exercise such additional care as the circumstances reasonably demanded.

VI. The court erred in giving the fourth instruction for plaintiff. The court has no right to invade the prov ince of the jury, by assuming as proven facts, matters which are in dispute upon the trial. This instruction in formed them that "if pushing a train increased the risk of plaintiff's husband, *it was negligence* on the part of the defendant *not to give timely notice of what he was doing,*" thereby assuming that defendant did not give timely notice, and confining the jury to an investigation of one question only; whether pushing the train increased the risk of the deceased. The defendant contended that it did give timely notice by ringing the engine bell, and many witnesses testified that the bell did ring. Plain tiff's testimony was to the effect that the bell did not ring, and the court should not have assumed by this charge that timely notice was not given. Louisville & Nashville R. R. Co. v. Yniestra, 21 Fla. 700; Ashmead v. Wilson, 22 Fla. 255; Doyle v. State, 39 Fla. 155, 22 South. Rep. 272.

VII. Several objections presented, and most earnest ly insisted upon by appellant to the fifth instruction given at plaintiff's request, are fully and completely answered by the statement that the provisions of section 1, Chap.

3744, act of 1887, apply to this case; and that under these provisions contributory negligence is not a complete defense in bar, but operates only in reduction or diminution of damages. The plaintiff, under these provisions, is entitled to recover if defendant's negligence was one of the proximate contributing causes to the injury of the deceased, notwithstanding the deceased's negligence was greater than that of the defendant. This statute does not introduce into this State the Illinois doctrine of comparative negligence, nor that prevailing in Tennessee, nor does it introduce in its entirety that prevailing in the State of Georgia; consequently, the decisions cited from those States are inapplicable to this case, upon a proper construction of our statutes. It is true that our statute is taken almost literally from similar provisions in the Georgia Code (Duval v. Hunt, 34 Fla. 85, 15 So. Rep. 876; Florida Central & Peninsular R. R. Co. v. Williams, 37 Fla. 406, 20 South. Rep. 558); but these provisions of the Georgia Code are construed in connection with, and are limited by, another provision of the same Code which was omitted from our statute, *viz*: "If the plaintiff by ordinary care could have avoided the injury to himself caused by the defendant's negligence, he can not recover at all." Macon & Western R. R. Co. v. Johnson, 38 Ga. 409; Savannah, Florida & Western Ry. Co. v. Stewart, 71 Ga. 427. The plain construction of our statute, in the absence of a provision similar to the one quoted, is that plaintiff is not debarred from recovering unless the injury was caused entirely by his own negligence, or by his consent; but that in all cases where the negligence of the plaintiff and defendant produces the injury, the plaintiff's damages are to be diminished by the jury in proportion to the default attributable to him. This being the proper construction of the statute

it follows that the court committed no error in giving the first paragraph of its own charge, or in refusing the thirteenth and seventeenth instructions requested by defendant.

2. The eighth instruction given on behalf of plaintiff was erroneous in using the word "remotely." The failure to exercise ordinary care and prudence might in some instances contribute remotely to an injury, while in others it might not only contribute directly, but very greatly, to the injury. The degree of negligence attributable to the plaintiff is a question to be considered by the jury in assessing damages, and where the facts are disputed, as in this case, the court should not assume in its instructions that the negligence of the deceased, if any, contributed only remotely to the injury. In other respects the instruction is correct, and the word "remotely" should be eliminated upon another trial.

3. The appellant contends that the fifth instruction given at plaintiff's request is erroneous, because it held defendant liable for failure to use proper means to avoid the accident after it saw, or, in the exercise of due care, *should have seen*, the peril surrounding the deceased or defendant's railroad track. It is admitted that the charge correctly stated the law applicable in this respect, to public crossings over defendant's track, but it is insisted that the injury occurred below the crossing, that deceased was a trespasser, that defendant was under no obligation to keep a lookout for trespassers, and can only be held liable for a failure to exercise care in avoiding injuries to trespassers when and after it actually sees the trespasser on its track. According to the testimony, the collision occurred within fifty feet of the public crossing; by some of the witnesses it occurred within ten feet thereof, and all the evidence tended to show that

the deceased was injured while endeavoring to cross the track where it was laid in the most prominent street in the village. A person is not a trespasser who crosses a street at a place other than a public crossing, or the intersection of other streets. Brunswick & W. R. Co. v. Gibson, 97 Ga. 489, 25 S. E. Rep. 484, 5 Am. & Eng. R. R. Cas. (n. s.) 441. And if the injury occurred so near a public crossing that the means required to be adopted by those operating the train to enable a traveler to cross in safety at the public crossing, if carried out, would have enabled the person injured to cross in safety at the place of the accident, we think the liability of the defendant will be measured by the legal principles applicable to public crossings. Baltimore & Ohio R. Co. v. Owings, 65 Md. 502, 5 Atl. Rep. 329, 28 Am. & Eng. R. R. Cas. 639. Whatever may be the rule as to the duty of a railroad company to keep a lookout for trespassers upon its track in general, we hold that in the streets of towns and villages, and in the immediate vicinity of public crossings, the company is bound to keep a lookout when making flying switches, or backing cars by the "kicking back" process, and that when it is apparent, or when in the exercise of reasonable diligence commensurate with the surroundings it should be apparent, to the company that a person on its track or about to get on its track under such circumstances, is unaware of his danger or can not get out of the way, it becomes the duty of the company to use such precautions by warnings, applying brakes or otherwise, as may be reasonably necessary to avoid the injury; for, as said by this court in Florida Central & Peninsular R. R. Co. v. Williams, 37 Fla. 406, 20 South. Rep. 558, "though the plaintiff may have been guilty of contributory negligence in stepping upon the track immediately in front

of a moving engine, yet the defendant," under the act of 1887, "is still liable for the injury if it could have prevented it by the exercise of reasonable and proper care after the discovery of the plaintiff's negligent act, or if it could have discovered it by the exercise of such care, in time to avoid the injury." Norfolk & W. R. Co. v. Burge, 84 Va. 63, 4 S. E. Rep. 21; Patton v. East Tennessee, Va. & Ga. R. Co., 89 Tenn. 370, 15 S. W. Rep. 919, 12 L. R. A. 184.

4. From what has been said it is apparent that the court did not err in refusing the fifth instruction requested by the defendant. True, it was the duty of the deceased to look and listen before crossing defendant's track, and if he failed to do so it was negligence on his part contributing to his injury, yet if the defendant, by failure to ring a bell, blow a signal or station a lookout, directly contributed to the injury, it would be liable to damages, diminished in proportion to deceased's contributory negligence. If, however, the failure of defendant to ring the bell, blow the signal or station a lookout, though negligent omissions on its part, did not directly or proximately contribute to deceased's injury, the defendant would not be liable.

VII. There was no error in giving the eleventh instruction requested by plaintiff. In the preceding paragraph we have considered all objections suggested by appellant, except the one which claims that defendant's duty under the circumstances of this case would have been completely performed by ringing the bell in the manner indicated by this instruction. The courts have frequently condemned the dangerous practice of "kicking cars," or making flying switches, in populous localities and near crossings, and have almost uniformly held that the increased hazard of these practices over the ordi-

nary manner of railway operation imposes upon the company a duty to station a lookout upon the rear of the cars, the equivalent of which is not accomplished by ringing the engine bell. 2 Wood on Railroads, §323, p. 1517; 3 Lawson's Rights, Remedies & Practice, §1187; 2 Shearman & Redfield on Negligence, §471; Beach on Contributory Negligence, §194. This precaution is much more effective than the simple ringing of a bell, and if persons are injured on or near crossings, or other places much frequented, where by the exercise of this precaution the injury could have been avoided, the company will be liable. If it be true, as contended by plaintiff, that the deceased when injured was crossing defendant's track, oblivious of the approach of a train, holding an open umbrella in such a manner as to obstruct his view of an approaching train, and a lookout stationed upon the rear of the car, in the exercise of reasonable diligence could and would have discovered the plaintiff's perilous situation in time to avert the collision by warnings, application of brakes or otherwise, then the failure to put a lookout on the rear of such train was negligence on defendant's part, contributing directly to the injury, and the plaintiff would be entitled to recover; the jury diminishing the damages in proportion to the default attributable to the deceased. Florida Central & Peninsular R. R. Co. v. Williams, 37 Fla. 406, 20 South. Rep. 558.

IX. The tenth instruction requested by defendant was properly refused. It is argued that the statutes then in force, section 33, p. 287 McClellan's Digest, only required defendant to ring its engine bell before crossing the streets of an incorporated town. This statute does not purport to define defendant's duty in this respect outside of incorporated towns, but leaves that to be de-

termined upon common law principles. Independently of statute it is the duty of those in charge of a train to give notice of their approach at all points of known or reasonably apprehended danger. This follows from the general rule requiring them to measure their precautions by, and to make them reasonably commensurate with, the conditions and circumstances by which they are surrounded. Chicago & Alton R. R. Co. v. Dillon, 123 Ill. 570, 15 N. E. Rep. 181, 32 Am. & Eng. R. R. Cas. 1; Winstanley v. Chicago, Milwaukee & St. Paul Ry. Co., 72 Wis. 375, 39 N. W. Rep. 856, 35 Am. & Eng. R. R. Cas. 370; Loucks v. Chicago, Milwaukee & St. Paul Ry. Co., 31 Minn. 526, 18 N. W. Rep. 651, 19 Am. & Eng. R. R. Cas. 305; Hinkle v. Richmond & Danville R. R. Co., 109 N. C. 472, 13 S. E. Rep. 884; Durkee v. Delaware & Hudson Canal Co., 88 Hun. 471; Delaware, Lackawana & Western R. R. Co. v. Converse, 139 U. S. 469, 11 Sup. Ct. Rep. 569; Louisville & Nashville R. R. Co. v. Commonwealth, 13 Bush, 388; Gates v. B. C. R. & M. R. Co., 39 Iowa, 45.

X. By the common law no damages were recoverable for the death of a human being. We are, therefore, without precedents as to the measure of damages in cases of this character, other than those based upon the construction of statutes varying in their language. A great majority of the courts of this country have held that in actions of this character the loss of the society of the deceased can not be considered in estimating damages. The basis for this array of precedents is the opinion of the English Court, construing Lord CAMPBELL's Act, in Blake v. Midland Counties Railway Company, 16 Jur. 562. We have examined a multitude of these cases, and in none of them have we found any reason given for disallowing this element, except in Pennsyl-

vania R. R. Co. v. Zebe, 33 Pa. St. 318, and the decision in this case is confessedly based upon, and the reasons given are practically those of, the English case. In the Pennsylvania case the main question considered was whether damages for mental suffering or wounded feelings could be allowed, and incidentally the court held that loss of society falls within the same category with mental suffering and should be disallowed. The English case, though confined entirely to the question of mental suffering, has been generally cited as authority for excluding damages for loss of society and protection of a husband. The reasoning of that decision is based upon four propositions: first, the title of the act, "An Act for compensating the families of persons killed by accident," not "for solacing their wounded feelings;" second, the provision requiring the jury to divide between the persons, for whose benefit the action was brought, the amount recovered in such shares as they thought proper, and the impracticability of estimating and dividing the damages for mental anguish of and between the numerous persons for whose benefit the action is brought; third, because the language of the act seemed more appropriate to a loss of which some estimate might be made by calculation, than an indefinite sum, independent of all pecuniary estimate, to soothe the feelings; and, fourth, "if a jury were to proceed to estimate the relative degrees of mental anguish of a widow and twelve children from the death of the father of the family, a serious danger might arise of damages being given to the ruin of the defendants." In the Pennsylvania case it is said that such damages are speculative and fanciful, and it is there asserted that the great merit of the English rule is that "it is one of equality, compensating the rich and the poor, the refined and the cultivated, and those less

so, by the simple standard of pecuniary loss." While our statute has several features in common with Lord CAMPBELL's Act, it is essentially different in many important particulars. Unlike the English statute, it is not one for "compensating families," but one "fixing the liability of persons and corporations for damages resulting from death," &c. Our statute, unlike the English one, by giving a right of action to the administrator of the deceased, imposes the liability whether there be a family to compnsate or not. Its effect was to abrogate the common law rule, for which, if any reason ever existed, the world has long since outgrown it, denying damages for human life, and to affix a penalty by an award of pecuniary damages for a careless or wrongful act resulting in another's death. In authorizing suits to enforce this liability, our act gives the right to those who are supposed to suffer most by the death of the deceased, but on no account does the action fail for want of a person to sue, as with Lord CAMPBELL's Act. Other points of dissimilarity between them are: under the English statute the suit is brought by the administrator for the benefit of the beneficiaries, while the beneficiaries sue directly under our statute. Under the English statute the jury are required to apportion or divide the recovery among all the beneficiaries, while under ours no division is made, by the jury; and, indeed, if there be a husband or wife surviving, the exclusive right of action inures to him or her without reference to other members of the family. And so with minor children and dependents, the existence of a higher class of persons authorized to sue in the order named in the statute debars all other classes from any right of action themselves, or from participation in the recovery by the higher class. Duval v. Hunt, 34 Fla. 85, 15 South. Rep.

876.  In the Duval-Hunt case we held that where the suit was brought by dependents, their recovery was limited to an amount equal to the present worth of a future support for plaintiff, estimated upon the basis therein mentioned.  This view is entirely consistent with, and plainly conformable to, the nature and extent of the damages proximately suffered by one, *dependent upon the deceased for a support only*, because he has lost nothing by the death of the deceased except the support which he would have received had deceased lived; but it was not thereby determined, as insisted upon by the appellant, that the same rule for assessing damages for a dependent would apply to a suit by the wife or any other person authorized by the statute to sue.  Our statute requires the jury to give such damages "as the party entitled to sue may have sustained *by reason of the death* of the party killed," not such damages as the deceased might have recovered had he lived, as contended by appellee.  It is clear, therefore, that a widow is not entitled to recover for the pain and suffering of the deceased, because that is not a damage sustained by her, but by the deceased, and dies with his person, unless an administrator can recover therefor in a suit by him under the statute, as to which we express no .opinion.  The statute failing to declare what particular elements enter into the damages sustained by a widow by reason of the death of her husband, and the common law furnishing no guide for estimating damages sustained by one from the death of another, we must necessarily have recourse to the general rules governing the assessment of damages in other actions, and among the first we find that "the object of awarding damages is to give compensation for pecuniary loss; that is to put the plaintiff in the same position so far as money can do it, as he would have been

"if * * * the tort had not been committed." Sedg-
wick on Damages, §30. Another is that the damage to
be recovered must always be the natural and proximate
consequence of the act complained of. Sedgwick on
Damages, §122. Applying these principles to this case,
it is proper to inquire, who is the plaintiff? Of what
wrongful act does she complain? What has been the
natural and proximate consequence to her; or, stated
differently, what has she directly lost by reason of this
wrongful act? The answers are not difficult to give.
She is a widow complaining of the death of her husband
by the wrongful act of another, and she has lost all the
rights and benefits which she would have had a legal
claim to receive during the probable joint lives of herself
and husband, and those accruing after his death had she
survived him. Chief among those accruing to her dur-
ing their joint lives are the comfort, society, protection
and support of the husband. They are all eloquently
expressed in that portion of the marriage ceremony con-
stituting the contract between them, whereby the man
is required "to love her, comfort her, honor and keep her
in sickness and in health." There can be no question
that the wife's right to the society of the husband, is a
recognized legal right, as much so as the right to his
support. When one of the parties dies by the wrongful
act of another, the consequences are not merely the an-
nulment of a contract, or the ending of a partnership
organized for pecuniary gain; but the dissolution of the
only status known to the law in which the companion-
ship and society of the parties to each other is so essen-
tial that the relation will be annulled if that society be
wilfully withdrawn. The word *husband* or *wife* disasso-
ciated from all idea of companionship has but an empty
sound. The Pennsylvania court in a later case (Pennsyl-

vania R. R. Co. v. Goodman, 62 Pa. St. 329) recognizes the injustice of denying compensation for companionship of husband and wife in cases of this character, by holding that the husband's damages are to be "measured by the value of her services as a *wife or companion*; * * * that the pecuniary loss was to be measured by the nature of the service, characterized as it was by the relation in which the parties stood to each other. Certainly the service of a wife is pecuniarily more valuable than that of a mere hireling. The frugality, industry, usefulness, attention and tender solicitude of a wife and the mother of children surely make her services greater than those of an ordinary servant, and, therefore, worth more. These *elements* are not to be excluded from the consideration of a jury in making a mere money estimate of value." The comfort, society and protection of a husband are no more fanciful or speculative than the frugality, industry, usefulness, attention and tender solicitude of a wife, and the one can be compensated by that simple standard of pecuniary loss, by which the damages of the rich and the poor, the refined and cultivated, and those less so, are measured as the other. The right of a husband to recover damages for being deprived of the society of his wife by reason of injuries inflicted by the negligence of another has been often recognized at common law, though not in cases involving death; and it has never been considered that the damages on this account were either speculative, fanciful, or liable to bankrupt a defendant. Jones v. Utica & Black River R. R. Co., 40 Hun, 349; Ainley v. Manhattan Ry. Co., 47 Hun, 206; Blair v. Chicago & Alton R. R. Co., 89 Mo. 334, 1 S. W. Rep. 367; Furnish v. Missouri Pacific Ry. Co., 102 Mo. 669, 15 S. W. Rep. 315. In the following cases loss of society has been held a proper element for consideration

in estimating damage under various statutes in this class of cases, some of them confining such element to actions by a husband or widow: Richmond & Danville R. R. Co. v. Freeman, 97 Ala. 289, 11 South. Rep. 800; Munro v. Pacific Coast Dredging & Reclamation Co., 84 Cal. 515, 24 Pac. Rep. 303; Pepper v. Southern Pacific Company, 105 Cal. 389, 38 Pac. Rep. 974; Petrie v. Columbia & G. R. R. Co., 29 S. C. 303, 7 S. E. Rep. 515; Baltimore & Ohio R. R. Co. v. State, for use of Kelley, 24 Md. 271; Webb v. Denver & R. G. W. Ry. Co., 7 Utah, 17, 24 Pac. Rep. 616; Baltimore & Ohio R. R. Co. v. Neell's Adm'r., 32 Gratt. 394; Simmons v. McConnell, 86 Va. 494, 10 S. E. Rep. 838; Wells v. Denver & R. G. W. Ry. Co., 7 Utah, 482, 27 Pac. Rep. 688; Hyde v. Union Pac. Ry. Co., 7 Utah, 356, 26 Pac. Rep. 979. The case of Webb v. Denver & R. G. W. Ry. Co., 7 Utah, 17, 24 Pac. Rep. 616, has been cited to sustain the proposition that loss of society is not an element of damage in this class of cases. That case holds that a mother is entitled to recover only her pecuniary loss, and not for mental pain and suffering caused by the death of a child, in an action for damages under a statute somewhat similar to Lord Campbell's Act, but it is there admitted that the word "pecuniary," in this connection, "is not construed in any very strict sense, and the tendency is to still greater liability and to include every element of injury that may be deemed to have a pecuniary value, although this value may not be susceptible of positive proof, and can only be vaguely estimated. It may include the loss of nurture, of the intellectual, moral, and physical training which a mother only can give to children; * * * the loss of the society of a near relative." The same court has held that while nothing is to be allowed for mental suffering or as a solace for feelings,

the jury may allow damages to a widow and daughter for being deprived of the support, care, nurture, companionship, assistance and protection of the deceased (Wells v. Denver & R. G. W. Ry. Co., 7 Utah, 482, 27 Pac. Rep. 688), and, in an action by parents, that the jury may take into consideration the loss to the parents of the society of their child. Hyde v. Union Pac. Ry. Co., 7 Utah, 356, 26 Pac. Rep. 979. Under our statute we hold that in estimating the pecuniary loss sustained by a widow in consequence of the death of her husband, the jury may properly take into consideration the loss of the comfort, protection and society of the husband in the light of all the evidence in the case relating to the character, habits and conduct of the husband as husband, and to the marital relations between the parties at the time of and prior to his death. The sixth instruction on behalf of the plaintiff was properly given, and the court correctly refused the fourteenth instruction requested by defendant because it excluded the elements of "comfort, protection and society" from the consideration of the jury.

(2) The second instruction by the court of its own motion, as well as the fourteenth instruction requested by defendant, in that they each authorized the jury to give plaintiff as damages the full sum of the probable future earnings of the deceased, taking into consideration his age, health, business capacity, habits, experience, and the value of his services in the care of his family, were erroneous. The widow is not entitled to the gross sum of her husband's future earnings. The deceased would necessarily have consumed at least a portion of those earnings for his own individual benefit had he lived.

It is a difficult matter to lay down general rules by

which to estimate damages in this class of cases. Those which occur to us as being applicable to this case, so far as we can judge from the evidence in the record, are as follows: In estimating the pecuniary loss sustained by the widow, the jury may properly take into consideration her loss of the comfort, protection and society of the husband in the light of all the evidence in the case relating to the character, habits and conduct of the husband as husband, and to the marital relations between the parties at the time of and prior to his death; and they may also consider his services in assisting her in the care of the family, if any, but the widow is not entitled to recover for her mental anxiety or distress over the death of her husband, nor for his mental or physical suffering from the result of the injury. She is also entitled to recover reasonable compensation for the loss of support which her husband was legally bound to give her, based upon his probable future earnings and other acquisitions, and the station or condition in society which he would probably have occupied according to his past history in that respect, and his reasonable expectations in the future; his earnings and acquisitions to be estimated upon the basis of the deceased's age, health, business capacity, habits, experience, energy and his present and future prospects for business success at the time of his death. All these elements to be based upon the probable joint lives of herself and husband. She is also entitled to compensation for loss of whatever she might reasonably have expected to receive in the way of dower or legacies from her husband's estate, in case her life expectancy be greater than his. The sum total of all these elements to be reduced to a money value, and its present worth to be given as damages. Tiffany on Death by Wrongful Act,

§§158, 159, 166; 3 Wood on Railroads, §414; 2 Sedg-
wick on Damages, §§573 *et seq.*   Within these limits the
jury exercise a reasonable discretion as to the amount to
be awarded, based upon the facts in evidence and the
knowledge and experience possessed by them in rela-
tion to matters of common knowledge and information.
Tiffany on Death by Wrongful Act, §177; Kansas Pacific
Ry. Co. v. Miller, 2 Colo. 442; City of Chicago v. Schol-
ten, 75 Ill. 468.

In view of other instructions to the jury, to the effect
that they should not give damages for the pain and suf-
fering of the deceased, nor for the grief and wounded
feelings of the surviving relatives, we discover no error
in the seventh and tenth instructions given on behalf of
plaintiff, except that they do not clearly embrace the idea
that the jury in estimating damages must be governed
by, and not go outside of, the evidence and the knowl-
edge and experience possessed by all persons in relation
to matters of common knowledge and observation. Upon
another trial they should be amended in this respect.

The ninth instruction for plaintiff was erroneous, be-
cause it authorized the jury to give as damages the value
of the life of the deceased, and gave them too much dis-
cretion in estimating the damages.   Duval v. Hunt, 34
Fla. 85, 15 South. Rep. 876.   Her recovery is not the
value of the deceased's life generally, but the value of
that life to her, or the loss sustained by her from the
premature death of the deceased, as shown by the proofs.

The judgment is reversed and a new trial granted.